**CONAGRA FOODS, INC., Plaintiff Below–Appellant,**

v.

**LEXINGTON INSURANCE CO., Defendant Below–Appellee.**

**No. 227, 2010.**

Supreme Court of Delaware.

Submitted: April 7, 2011.
Decided: April 28, 2011.
Rehearing Denied June 17, 2011.

---

John E. James, Esquire, of Potter Anderson & Corroon, LLP, Wilmington, DE; Of Counsel: Jonathan M. Cohen (argued) and William E. Copley, Esquires, of Gilbert, LLP, Washington, D.C., for Appellant.

Denise Seastone Kraft, Paul D. Brown, Aleine M. Porterfield, Esquires, of Edwards Angell Palmer & Dodge, LLP, Wilmington, DE; Of Counsel: Stephen M. Prignano, Esquire, (argued) of Edwards Angell Palmer & Dodge, LLP, Providence, RI, for Appellee.

Before STEELE, Chief Justice, HOLLAND, JACOBS, RIDGELY, Justices, and NEWELL, Judge,[1] constituting the Court en Banc.

RIDGELY, Justice, for the Majority:

This case arises from the alleged contamination in 2007 of certain Peter Pan® and Great Value® peanut butter products that Plaintiff–Below/Appellant, ConAgra Foods, Inc. ("ConAgra"), manufactured at its Sylvester, Georgia plant site. The Centers for Disease Control ("CDC") informed ConAgra that it suspected a link between a certain strain of salmonella and those peanut butter products. Thereafter, ConAgra announced a voluntary, nationwide recall of all its peanut butter products. But, some of the peanut butter products reached consumers, and many of those consumers have sued ConAgra.

ConAgra had purchased an insurance policy from Defendant–Below/Appellee, Lexington Insurance Co. ("Lexington"), to insure itself against personal injury claims arising from contamination of its products. ConAgra sought coverage under that policy. Lexington denied coverage. ConAgra and Lexington have different views on the extent to which the insurance policy provides coverage because they interpret the provision in that policy called the "lot or batch" provision differently. For insurance coverage purposes, a "lot or batch" provision may operate to treat as a group all insurance claims that arise out of the same lot or batch of products. ConAgra contends that the "lot or batch" provision serves to expand coverage and does not apply where there is a single "occurrence," as defined by the policy. Lexington claims that the "lot or batch" provision applies to limit coverage and requires ConAgra to satisfy a separate deductible ("retained limit") for each separate lot or batch to access coverage. The Superior Court upheld Lexington's position.

We conclude that the "lot or batch" provision of the policy is ambiguous. Under

1. Sitting by designation pursuant to Del. Const. art. IV, § 12 and Supr. Ct. R. 2 & 4.

one of the two reasonable interpretations of the "lot or batch" provision, Lexington's duties to defend and indemnify were triggered. Because the policy arguably provides coverage to ConAgra, Lexington's duty to defend was thereby triggered when ConAgra satisfied the applicable "retained limit" for a single "occurrence." Accordingly, we reverse the judgment of the Superior Court and remand to ascertain the intent underlying the ambiguous policy language for purposes of determining whether there is ultimate policy coverage.

### The Policy

Nearly five years ago, ConAgra purchased an "Umbrella Prime® Commercial Umbrella Liability Insurance with Crisis Response®" insurance policy (the "Policy") from Lexington. Under the terms of the Policy, ConAgra paid Lexington $1.15 million in premiums. In exchange for those premium payments, Lexington insured ConAgra against many risks. One of those risks was the Products–Completed Operations Hazard, which the Policy defines as "all Bodily Injury and Property Damage occurring away from premises [ConAgra] own[s] or rent[s] and arising out of [ConAgra] Product. . . ." The Policy defines the term "Occurrence" for general liability purposes as follows: "as respects Bodily Injury or Property Damage, an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one Occurrence[ ]" (a "General Liability Occurrence").

If that were the only definition of "Occurrence," interpretation of the Policy would be straightforward. But, the Policy is a relatively complex sixty-six page document, which includes twenty-one endorsements. One of those endorsements,

Endorsement # 3—the "Lot or Batch Provision"—contains a separate definition of "occurrence," as follows:

Section IV. LIMITS OF INSURANCE is amended to include the following additional paragraph:

With respect to the Products–Completed Operations Hazard, all Bodily Injury or Property Damage arising out of one lot or batch of products prepared or acquired by you, shall be considered one Occurrence. Such Occurrence shall be subject to the Each Occurrence and General Aggregate Limits of this policy shown in Item 3. of the Declarations and shall be deemed to occur when the Bodily Injury or Property Damage occurs for the first claim of the claim of that lot or batch.

For the purposes of this Endorsement, Lot of Batch is defined as a single production run at a single facility not to exceed a 7 day period.

Nothing in this endorsement shall be construed to provide coverage for any Occurrences taking place outside the Policy Period.

All other terms, definitions, conditions and exclusions of this policy remain unchanged.

Thus, the Lot or Batch Provision provides another definition of the term "Occurrence" (a "Lot or Batch Occurrence").

The Policy's two different definitions of the term "Occurrence" are relevant because Endorsement # 10—the "Retained Limit Amendatory Endorsement"—contains a "Schedule of Retained Limits," which prescribes different retained limits for a General Liability Occurrence, on the one hand, and for a Lot or Batch Occurrence, on the other. The Policy defines "Retained Limit" as "the Self–Insured Retention applicable to each Occurrence that results in damages not covered by Sched-

uled Underlying Insurance nor any applicable Other Insurance providing coverage to the Insured." In other words, the Retained Limit, like a deductible, is the amount of liability that ConAgra must itself pay, to trigger Lexington's contractual duties to pay for ConAgra's defense and tort liabilities. For a General Liability Occurrence, the Schedule of Retained Limits provides that ConAgra must pay $3 million per Occurrence or $9 million regardless of the number of Occurrences, to trigger Lexington's duties under the Policy. For a Lot or Batch Occurrence, the Schedule of Retained Limits requires ConAgra to pay $5 million per Occurrence, regardless of the aggregate liability that ConAgra pays, to trigger Lexington's duties under the Policy. If a Retained Limit is satisfied, the Policy limits Lexington's liability to $25 million.

### The Salmonella–Tainted Peanut Butter

The Policy had a term of one year. During that year, an event occurred at ConAgra's Sylvester, Georgia plant site, where ConAgra manufactures peanut butter. The CDC informed ConAgra that it suspected a link between a certain strain of salmonella and the peanut butter that ConAgra manufactured. ConAgra immediately announced a voluntary, nationwide recall of all its peanut butter products. Thereafter, the United States Food and Drug Administration cautioned consumers not to eat Peter Pan® or Great Value® brand peanut butter that bore code number 2111, which was used to identify all peanut butter products that ConAgra manufactured at its Sylvester, Georgia plant site. In its complaint, ConAgra alleges that approximately twenty thousand people will bring bodily injury or illness claims in courts throughout the country. ConAgra also alleges that it has settled or otherwise resolved over two thousand claims.

### Lexington Denies Coverage

Shortly after the CDC informed ConAgra of the suspected link, ConAgra contacted Lexington about coverage for the claims arising from the contaminated peanut butter (the "Peanut Butter Claims"). Approximately nine months later, Lexington preliminarily reserved its rights under the Policy in a letter to ConAgra that relevantly stated:

> [W]e request a face-to-face meeting to discuss these cases and related coverage issues. . . .

> In the interim, Lexington preliminarily reserves its rights, including, but not limited to, the right to limit or decline coverage of the claims discussed herein, or later asserted, under the Policy and consistent with Lexington's findings and analysis pending completion of our ongoing investigation of the [Peanut Butter Claims].

In that letter, Lexington also explicitly referred to the Lot or Batch Provision, explaining: "The coverage provided under the Policy is guided by several provisions, including, and without limitation . . . Endorsement No. 3 (Lot or Batch). . . . Please be advised that Lot or Batch is defined as 'a single production run at a single facility not to exceed a 7–day period.' "

Six months later, ConAgra sent a letter to Lexington that requested a statement of Lexington's coverage position, as well as any advice regarding settlement of the Peanut Butter Claims. Over the next six months, ConAgra and Lexington exchanged more letters, and ConAgra provided Lexington with numerous documents to aid Lexington in developing its coverage position. ConAgra also informed Lexington that it had paid or agreed to pay over $3 million in settlements. ConAgra believed that Lexington's duties under the Policy had been triggered because that

amount exceeded the Retained Limit for a General Liability Occurrence. In response, Lexington issued a reservation of rights letter that advised ConAgra of Lexington's position that the Lot or Batch Provision applied to the Peanut Butter Claims. Lexington informed ConAgra that Lexington's duties under the Policy had not been triggered because ConAgra had not demonstrated that it had exhausted the Retained Limit—$5 million—for any one Lot or Batch.

### Procedural History

Approximately three and one-half months later, ConAgra filed this action in the Superior Court, requesting compensatory and punitive damages for breach of contract and breach of the implied duty of good faith and fair dealing. ConAgra also requested a declaratory judgment that would define the scope of the parties' respective rights and obligations under the Policy for the Peanut Butter Claims. ConAgra further requested a declaratory judgment that would order Lexington to defend ConAgra, and pay defense costs that ConAgra incurred, in connection with the Peanut Butter Claims.

Lexington denied ConAgra's allegations and asserted numerous affirmative defenses. Lexington also counterclaimed for declaratory judgments regarding the application of the Lot or Batch Provision, exhaustion of the Retained Limits, and Lexington's duties to defend and indemnify. Finally, Lexington asked the Superior Court to declare that Lexington did not act in bad faith.

Lexington then moved for summary judgment, arguing that the Lot or Batch Provision should apply as a matter of law and that ConAgra's bad faith claim should be dismissed. ConAgra cross-moved for partial summary judgment, arguing that

Lexington's duty to defend had been triggered because the Peanut Butter claims at least arguably fell within the Policy coverage. ConAgra also argued that the Lot or Batch Provision did not apply to the Peanut Butter Claims. The Superior Court denied ConAgra's partial summary judgment motion and granted Lexington's summary judgment motion, in part, declining to dismiss ConAgra's bad faith claim. In a Memorandum Opinion,[2] the Superior Court explained:

The court finds that the insurance policy is not ambiguous. If the policy only defined "occurrence," ConAgra would be correct that there was only one occurrence, because the bodily injury claims arose collectively out of one cause-salmonella-tainted peanut butter made in one plant. And, because the peanut butter was made continuously, ConAgra would still be correct if the policy included an open-ended Lot or Batch Provision. But, the policy seemingly contemplates continuous production and, by its terms, the policy limits a lot or batch to all the product ConAgra manufactures in seven days, or less. Drilling down through the policy's terms hits the seven-day limit at the bottom. ConAgra's reading of the policy renders the seven-day limit meaningless.

Where lots or batches take longer than seven days, including the sort of continuous production ConAgra asserts, after seven days, for insurance purposes, a new lot or batch begins. The occurrence was not the delivery of a bad batch of peanuts. That is between ConAgra and the peanuts' supplier. The occurrence was ConAgra's negligently making defective peanut butter and putting it on the market, thereby causing bodily injury. In other words, although

**2.** *ConAgra Foods, Inc. v. Lexington Ins. Co.,* 2009 WL 3688014 (Del.Super. Oct. 30, 2009).

ConAgra did not segregate finished jars of peanut butter according to lots or batches, the insurance that it purchased segregates the production by runs of no more than seven days, each. The policy allows aggregation of the injured consumers' claims, but only to a point.

Even if, as ConAgra asserts, peanut butter's production is different from the other products manufactured by ConAgra that are also covered under the policy's umbrella, the seven day provision makes sense and it cannot simply be read out of the policy. The court appreciates ConAgra's point that its insurance policy will not respond until the claim is much larger. But, that is consistent with the policy's character as umbrella coverage. And, again, Lexington made it clear that there is no such thing as a production run lasting more than seven days for policy purposes.[3]

Lexington then moved for reargument on the bad faith claim, but the Superior Court denied that motion.[4] Pursuant to Supreme Court Rule 42 and Superior Court Civil Rule 74, both parties applied for certification of an interlocutory appeal. The Superior Court declined to certify that appeal because "such an appeal's outcome [would] not be case-dispositive."[5] We also refused the parties' interlocutory appeal.[6] ConAgra then agreed to withdraw with prejudice its bad faith claim against Lexington in order to obtain a final judgment and immediately pursue an appeal to this Court. The Superior Court entered a final order, and this appeal followed.

ConAgra raises four arguments on appeal. First, ConAgra contends that the Superior Court erred in concluding that the Lot or Batch Provision supplants the Policy's General Liability Occurrence definition, thereby disaggregating a single Occurrence into multiple Occurrences. Second, ConAgra contends that the Superior Court erred in concluding that the Lot or Batch Provision applies to continuous production processes, i.e., processes continuing beyond seven days. Third, ConAgra contends that the Superior Court erred in concluding that Lexington had not waived, and should not be estopped from asserting, the Lot or Batch Provision as a defense to coverage. Fourth, ConAgra contends that the Superior Court erred in concluding that the Peanut Butter claims have not triggered Lexington's duty to defend.

### Analysis

■ We review the Superior Court's grant or denial of a summary judgment motion *de novo*.[7] We also review the Superior Court's interpretation of an insurance contract *de novo*.[8] Here, the only questions raised on appeal are matters of contract interpretation. The parties agree that Delaware law applies to the interpretation of the Policy.

### The Policy is Ambiguous

■ This Court has adopted traditional principles of contract interpretation. One

3. *Id.* at \*4–5.

4. *ConAgra Foods, Inc. v. Lexington Ins. Co.,* 2010 WL 663746 (Del.Super. Jan. 21, 2010).

5. *ConAgra Foods, Inc. v. Lexington Ins. Co.,* 2010 WL 748171 (Del.Super. Feb. 4, 2010).

6. *ConAgra Foods, Inc. v. Lexington Ins. Co.,* 991 A.2d 17, 2010 WL 618025 (Del.2010) (TABLE).

7. *Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co.,* 996 A.2d 1254, 1256 (Del.2010).

8. *Pac. Ins. Co. v. Liberty Mut. Ins. Co.,* 956 A.2d 1246, 1254 (Del.2008) (citing *Eon Labs Mfg., Inc. v. Reliance Ins. Co.,* 756 A.2d 889, 892 (Del.2000)).

such principle is to give effect to the plain meaning of a contract's terms and provisions when the contract is clear and unambiguous.[9] But, "when we may reasonably ascribe multiple and different interpretations to a contract, we will find that the contract is ambiguous."[10]

■ We interpret insurance contracts similarly. "Clear and unambiguous language in an insurance contract should be given 'its ordinary and usual meaning.'"[11] "[W]here the language of a policy is clear and unequivocal, the parties are to be bound by its plain meaning."[12] "In construing insurance contracts, we have held that an ambiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'"[13] "An insurance contract is not ambiguous simply because the parties do not agree on its proper construction."[14] "[C]reating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented."[15] But, we also have explained that an insurance contract is ambiguous when it is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[16]

■ Applying those principles to this case, we conclude that the Policy is ambiguous, not "simply because the parties do not agree on its proper construction,"[17] but also because multiple and different interpretations may reasonably be ascribed to it.[18] On the one hand, one reasonably may interpret the Lot or Batch Provision as limiting coverage. The Lot or Batch Provision defines a "lot or batch" as "a single production run at a single facility not to exceed a 7 day period." The Lot or Batch Provision provides that "all Bodily Injury or Property Damages arising out of one lot or batch of products ... shall be considered one Occurrence." Reading those two elements of the Lot or Batch Provision together, one reasonably may interpret the Lot or Batch Provision as segmenting, for insurance coverage purposes, claims into separate seven day periods. That interpretation would disregard the actual number of Occurrences. Under that interpretation, Lexington's duties would be triggered only when ConAgra incurred $5 million in liability for a given seven day period. The Superior Court

9.  *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del.2010) (citing *Rhone–Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del.1992)).

10. *Id.* at 1160 (citing *Twin City Fire Ins. Co. v. Delaware Racing Ass'n*, 840 A.2d 624, 628 (Del.2003)).

11. *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288 (Del.2001) (quoting *Rhone–Poulenc*, 616 A.2d at 1195).

12. *Id.* (quoting *Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 745 (Del. 1997)).

13. *Id.* (quoting *Rhone–Poulenc*, 616 A.2d at 1196).

14. *Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1062 (Del.2010) (citing *Rhone–Poulenc*, 616 A.2d at 1196).

15. *O'Brien*, 785 A.2d at 288 (quoting *Rhone–Poulenc*, 616 A.2d at 1196).

16. *Phillips Home Builders, Inc. v. Travelers Ins. Co.*, 700 A.2d 127, 129 (Del.1997) (quoting *Rhone–Poulenc*, 616 A.2d at 1196).

17. *See Axis Reinsurance Co.*, 993 A.2d at 1062 (citing *Rhone–Poulenc*, 616 A.2d at 1196).

18. *See Phillips Home Builders*, 700 A.2d at 129 (quoting *Rhone–Poulenc*, 616 A.2d at 1196).

adopted that interpretation as the only reasonable interpretation of the Policy.[19]

At least one other court has found that interpretation persuasive. In *London Market Insurers v. Superior Court*,[20] a California appellate court considered whether a similarly worded "lot or batch" provision permitted thousands of individual asbestos exposures to be deemed a single "occurrence" for insurance coverage purposes.[21] The insurance policy at issue in *London Market* relevantly provided: "All ... damages arising out of one lot of goods or products prepared or acquired by the Named Insured or by another trading under his name shall be considered as arising out of one occurrence."[22] Although the *London Market* court concluded that the provision was ambiguous,[23] the court also explained that the "lot or batch" provision "preclude[d] treating all asbestos claims as a single 'occurrence.' "[24]

On the other hand, one also reasonably could interpret the Lot or Batch Provision as expanding coverage. Under that interpretation, the Lot or Batch Provision would operate to convert multiple claims in one lot or batch into a single Occurrence for insurance coverage purposes. But, that provision would not operate to convert multiple claims arising out of multiple lots or batches into distinct multiple Occurrences. Consistent with that interpretation, the Retained Limit for a General Liability Occurrence would apply. That is,

Lexington's duties would be triggered when ConAgra paid $3 million of liability claims. Under that interpretation, the Lot or Batch Provision would supplement the General Liability Occurrence. If multiple Occurrences arose from a single lot created during a seven-day period, those Occurrences would be aggregated pursuant to the Lot or Batch Provision. But, if only one Occurrence arose, the Lot or Batch Provision would not balkanize that one Occurrence into multiple Occurrences corresponding to seven-day intervals.

At least two other courts have adopted this interpretation. In *Diamond Shamrock Chemicals Co. v. Aetna Casualty & Surety Co.*,[25] a New Jersey appellate court interpreted a similarly worded "lot or batch" provision in the context of claims arising from the use of Agent Orange during the Vietnam War.[26] The United States used Agent Orange to defoliate Vietnamese jungle trails to deny enemy forces the benefit of concealment.[27] But, Agent Orange had a side effect—it made Vietnam War veterans more susceptible to various diseases.[28] Several veterans brought suit, and the chemical company that made Agent Orange sought insurance coverage.[29] The policy at issue in *Diamond Shamrock* relevantly provided: "[A]ll [ ] damages arising out of one lot of goods or products prepared or acquired by the named insured or by another trading under his name shall be considered as arising out of

**19.** *ConAgra Foods, Inc.*, 2009 WL 3688014, at \*3–5.

**20.** 146 Cal.App.4th 648, 53 Cal.Rptr.3d 154 (2007).

**21.** *Id.* at 170.

**22.** *Id.* at 162.

**23.** *Id.* at 171 n. 8.

**24.** *Id.* at 170.

**25.** 258 N.J.Super. 167, 609 A.2d 440 (App. Div.1992), *petition for cert. denied*, 134 N.J. 481, 634 A.2d 528 (1993) (TABLE).

**26.** *Id.* at 479–80.

**27.** *Id.* at 452.

**28.** *Id.* at 452–53.

**29.** *Id.*

one occurrence."[30] The insurers contended that the provision operated to make each of the 133 lots of Agent Orange delivered to the military a single occurrence.[31] The *Diamond Shamrock* court rejected that argument and agreed with the lower court that the provision was intended to apply only to manufacturing defects, and not to design errors.[32] The court recognized that the manufacturing-design distinction was debatable, but it concluded that the following principle was "indisputable":

> The intent of the parties in adding the batch clause to the policies was to minimize the number of occurrences in order to maximize coverage. If the batch clause is interpreted to require aggregation of deductibles to correspond with the number of lots distributed, it will run counter to the parties' intent. On the other hand, although the language of the batch clause makes no distinction between manufacturing and design defects, the Chancery Division's interpretation of the provision is consistent with the purpose of the clause and the parties' understanding.

> While the question is far from clear, we choose the interpretation of the contractual language that best advances the purpose of the clause and comports with the parties' intent. We are convinced that the clause should be applied only where the product manufactured is nonconforming, not where the product is consistent with a faulty design. The equation of "lots" and "occurrences" is

consistent with the idea that the clause is designed to prevent the stacking of deductibles where manufacturing errors have taken place. The Chancery Division's construction of the clause also comports with the rationale of the cases we cited previously, referring to the cause of the injury in defining the number of occurrences.[33]

The United States District Court for the District of Maryland and the United States Court of Appeals for the Fourth Circuit also have concluded that a "lot or batch" provision similar to the one in this case should be interpreted to expand coverage. In *Nationwide Mutual Insurance Co. v. Lafarge Corp.*,[34] those courts interpreted that provision in the context of claims for property damage arising from the sale of poorly performing cement.[35] The policy at issue in *Lafarge* relevantly provided: "[W]hen goods or products are of one prepared or acquired lot, all claims arising therefrom shall be deemed to have arisen from a common cause and to constitute one occurrence or accident."[36] The insurer contended that the provision operated to make each lot of defective cement a single occurrence.[37] The district court rejected the insurer's interpretation and explained:

> The purpose of a batch clause is to limit the number of occurrences, not to expand it.

> If this Court were to find that each lot constituted an occurrence, then La-

---

30. *Id.* at 480.

31. *Id.*

32. *Id.*

33. *Id.* (citation omitted).

34. Civ. Nos. H–90–2390, H–93–4173, Bench Op. (D.Md. Oct. 31, 1995), *aff'd*, 121 F.3d

699, 1997 WL 532509 (4th Cir.1997) (TABLE).

35. *Lafarge*, 1997 WL 532509, at *1.

36. *Lafarge*, Civ. Nos. H–90–2390, H–93–4173, Bench Op., at 4039.

37. *Id.* at 4040; *Lafarge*, 1997 WL 532509, at *4.

farge's insurance coverage would be eviscerated. That result is clearly not what the parties intended.[38]

The district court concluded: "The lot clauses plainly apply to situations when multiple claims arise from a single defective lot. They do not purport to extend to situations when multiple claims arise from multiple lots."[39] The Fourth Circuit agreed with that interpretation and explained:

> After reviewing the district court's extensive opinion from the bench on this issue, we agree with the court's interpretation of "each occurrence," its conclusion that the "occurrence" and underlying cause of the liability was the "continuous, large-scale manufacture and sale" of defective cement, and its holding that there was only one "occurrence" for deductible purposes. Here, we affirm on the reasoning of the district court.[40]

Given the two reasonable and competing interpretations before us—one that limits coverage and one that expands coverage—we conclude that the Lot or Batch Provision is ambiguous.[41] That ambiguity permits a court to consider extrinsic evidence of the parties' intent.[42] In this case, the extrinsic evidence reveals that the Lot or Batch Provision was negotiated.[43] We therefore remand this case for the Superior Court to consider extrinsic evidence of what the parties intended when agreeing to Endorsement # 3. If the extrinsic evidence does not reveal the parties' intent as to the Lot or Batch Provision, then the Superior Court should apply the "last resort" rule of *contra proferentem* and interpret it in favor of ConAgra.[44]

### Lexington Has a Duty to Defend

■ The duty to defend may be broader than the duty to ultimately indem-

---

**38.** *Lafarge*, Civ. Nos. H–90–2390, H–93–4173, Bench Op., at 4040 (citing *Diamond Shamrock*, 609 A.2d at 480).

**39.** *Id.* at 4041.

**40.** *Lafarge*, 1997 WL 532509, at *4.

**41.** *See Phillips Home Builders*, 700 A.2d at 129 (quoting *Rhone–Poulenc*, 616 A.2d at 1196).

**42.** *AT & T Corp. v. Lillis*, 953 A.2d 241, 252–53 (Del.2008) (citing *Appriva S'holder Litig. Co., LLC v. ev3, Inc.*, 937 A.2d 1275, 1291 (Del.2007)).

**43.** In reply to an inquiry by this Court during the course of this appeal, the parties have proffered extrinsic evidence that was produced during discovery before the Superior Court granted summary judgment in Lexington's favor. That extrinsic evidence includes meeting notes and email exchanges. The documents reflect that the parties actively discussed the Lot or Batch Provision, including whether a Lot or Batch should be defined as a single production run at a single facility not

to exceed a 7 day period or a 24 hour period. ConAgra argues that "[t]he extrinsic evidence shows that the wording of the terms . . . was drafted exclusively by Lexington." Lexington argues that the documents reflect that the Lot or Batch Provision was "the product of [an] arms' length negotiation[] between sophisticated parties of equal bargaining power." We do not address the intention of the parties at this stage because this extrinsic evidence is now a matter for the Superior Court to address in the first instance on remand.

**44.** *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1114 (Del.1985) ("[T]he rule of *contra proferentem* is one of last resort, such that a court will not apply it if a problem in construction can be resolved by applying more favored rules of construction.") (citing *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4 (2d Cir.1983)). *See also* 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 32:12 (4th ed. 1993 & Supp.2010) ("The rule of *contra proferentem* is generally said to be a rule of last resort and is applied only where other secondary rules of interpretation have failed to elucidate the contract's meaning.").

nify.[45] In assessing either of those duties, "a court typically looks to the allegations of the complaint to decide whether the third party's action against the insured states a claim covered by the policy, thereby triggering the duty to defend."[46] "The test is whether the underlying complaint, read as a whole, alleges a risk within the coverage of the policy."[47] In determining whether an insurer is bound to defend an action against an insured, we apply the following principles: (1) "where there is some doubt as to whether the complaint against the insured alleges a risk insured against, that doubt should be resolved in favor of the insured," (2) "any ambiguity in the pleadings should be resolved against the carrier," and (3) "if even one count or theory alleged in the complaint lies within the policy coverage, the duty to defend arises."[48]

▮ Here, we conclude that the Lot or Batch Provision is ambiguous because it is susceptible to two reasonable and competing interpretations—one that limits coverage and one that expands coverage. Because the latter interpretation arguably applies in this case, ConAgra need not satisfy the Retained Limit for a Lot or Batch Occurrence—$5 million—to trigger Lexington's duty to defend. Rather, consistent with the interpretation of the Lot or Batch Provision that expands coverage, ConAgra need only satisfy the Retained Limit for a General Liability Occurrence— $3 million. ConAgra surpassed that threshold approximately three years ago. Consequently, Lexington's duty to defend was triggered as of the date that ConAgra's liabilities exceeded the $3 million Retained Limit for a General Liability Occurrence.[49] Whether or not there is ultimate coverage is for the Superior Court to determine, upon an expanded record, on remand.

### Conclusion

The judgment of the Superior Court is **REVERSED** and **REMANDED** for proceedings consistent with this Opinion.

STEELE, Chief Justice, and NEWELL, Judge, dissenting:

ConAgra Foods, Inc. filed suit against Lexington Insurance Co. to obtain insurance coverage for claims arising out of ConAgra's production of salmonella-tainted peanut butter. The Superior Court awarded summary judgment to Lexington on the basis of the insurance contract between the parties. ConAgra now appeals this judgment. Because we believe the contractual text is unambiguous and favors Lexington's position, we would affirm. Therefore, we respectfully dissent.

### I. FACTS AND PROCEDURAL HISTORY

In 2006, ConAgra bought an insurance policy from Lexington which provides broad general liability coverage to ConAgra once ConAgra satisfies stipulated retained limits. These retained limits operate like deductibles—ConAgra pays up to the stipulated level, and under the conditions provided in the contract, Lexington

**45.** *Am. Ins. Grp. v. Risk Enter. Mgmt., Ltd.,* 761 A.2d 826, 830 (Del.2000) (citing *Charles E. Brohawn & Bros., Inc. v. Emp'rs Comm. Union Ins. Co.,* 409 A.2d 1055, 1058 (Del. 1979)).

**46.** *Pac. Ins. Co.,* 956 A.2d at 1254 (quoting *Risk Enter. Mgmt.,* 761 A.2d at 829).

**47.** *Id.* (citing *Cont'l Cas. Co. v. Alexis I. duPont Sch. Dist.,* 317 A.2d 101, 103 (Del. 1974)).

**48.** *Id.* (citing *Alexis I. duPont,* 317 A.2d at 105).

**49.** *See id.*

pays ConAgra's liabilities that exceed the retained limits. The general liability retained limit is $3 million for what the policy defines as a general "Occurrence." [50]

With regard to product liability claims specifically, the policy provides coverage according to a defined "Products–Completed Operations Hazard." [51] The policy clarifies the limits of coverage pertaining to this Products–Completed Operations Hazard in the "Lot or Batch Provision" made part of the policy by Endorsement # 3. According to Endorsement # 3, "[w]ith respect to the Products–Completed Operations Hazard, all Bodily Injury or Property Damage arising out of one lot or batch of products prepared or acquired by [ConAgra], shall be considered one Occurrence." Endorsement # 3 also defines "lot or batch" as "a single production run at a single facility not to exceed a 7 day period." Finally, Endorsement # 10 amends the schedule of retained limits applicable under various conditions to show that while the limit for general liability is $3 million per Occurrence, the limit for lot or batch coverage is $5 million per Occurrence.

ConAgra manufactures its peanut butter at a plant in Sylvester, Georgia in an uninterrupted, continuous process that exceeds seven days in duration. On February 15, 2007, ConAgra notified Lexington that it had recalled Peter Pan Peanut Butter it produced at its Georgia plant after the Centers for Disease Control identified salmonella contamination in the peanut but-

ter. Later, ConAgra faced thousands of claims asserting that ConAgra was liable for damages for its failure to detect and eliminate the salmonella at its Georgia plant.

ConAgra notified Lexington that defending the peanut butter claims would likely exceed the $3 million retained limit on general liability and trigger Lexington's obligations under the policy. On November 8, 2007, Lexington issued a reservation of rights letter advising ConAgra of the potential applicability of the Lot or Batch Provision and requesting documents related to ConAgra's manufacturing process. On June 23, 2008, ConAgra informed Lexington that it was about to exceed the $3 million general liability retained limit, and on June 25, 2008, ConAgra exceeded it. On October 31, 2008, Lexington sent ConAgra another reservation of rights letter in which it informed ConAgra that the Lot or Batch Provision applied. In this letter, Lexington did not deny coverage, but informed ConAgra of its belief that ConAgra had not yet triggered Lexington's obligations because ConAgra had not alleged that it had satisfied the $5 million retained limit applicable under the Lot or Batch Provision.

The central issue in this case is whether the Lot or Batch Provision applies. ConAgra argues that it does not apply. According to ConAgra, the general Occurrence definition applies, the peanut butter claims arise from a single Occurrence, and ConA-

---

**50.** The contract generally defines "Occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one Occurrence."

**51.** The contract defines the "Products Completed Operations Hazard," in relevant part, as "all Bodily Injury and Property Damage

occurring away from premises [ConAgra] own[s] or rent[s] and arising out of [ConAgra's] Product or [ConAgra's] Work." It explicitly excludes products still in ConAgra's physical possession, work ConAgra has not yet completed or abandoned, and bodily injury or property damage arising out of the transportation of property or the existence of tools, uninstalled equipment, or abandoned or unused materials.

gra must pay a single $3 million retained limit in order to trigger Lexington's coverage obligation. Because ConAgra has spent more than $3 million defending against the peanut butter claims, it argues that it has triggered Lexington's insurance coverage. Contrarily, Lexington argues that the Lot or Batch Provision applies. According to Lexington, the Endorsement's Occurrence definition applies, the peanut butter claims arise out of multiple lots or batches of product, and therefore ConAgra must pay a $5 million retained limit for each lot or batch represented by the peanut butter claims before it triggers Lexington's coverage obligation. Because ConAgra neither has asserted that it has exceeded the $5 million lot or batch retained limit, nor has provided documentation to that effect, Lexington argues that it has no coverage obligation.

The parties pursued the same arguments in Superior Court. ConAgra sued Lexington to collect all excess liability over the $3 million general retained limit. Lexington counterclaimed and sought a declaration that the Lot or Batch Provision applied and that it had no coverage obligation unless and until ConAgra exceeded the $5 million per lot or batch retained limit. Lexington filed a Motion for Summary Judgment and ConAgra filed a Cross Motion for Summary Judgment. A Superior Court judge found the insurance policy unambiguous, agreed that the Endorsement's Occurrence definition applied and granted summary judgment to Lexington. ConAgra appeals that judgment.

## II. STANDARD OF REVIEW

We review a trial court's decision to grant summary judgment *de novo* with respect to both the facts and the law.[52] We also review the proper interpretation and construction of an insurance contract *de novo*.[53] If the relevant contract language is clear and unambiguous, we must give it its plain meaning.[54]

## III. ANALYSIS

We believe the language of this insurance policy is clear and unambiguous on its face. The Products–Completed Operations Hazard provisions of the policy apply to product liability claims, and Endorsement # 3 changes the definition of Occurrence for purposes of those claims. The peanut butter claims in this case fall within the purview of the Products–Completed Operations Hazard because they are bodily injury claims occurring away from ConAgra's premises and arising out of ConAgra's products. Endorsement # 3 instructs the parties to treat as a single Occurrence all bodily injury claims that arise from each lot or batch of product, and it defines a "lot or batch" as "a single production run at a single facility not to exceed a 7 day period." Consequently, with respect to products liability claims arising out of the Products–Completed Operations Hazard, there is one Occurrence for, at most, every seven day period of production during which bodily injury claims, like the peanut butter claims here, arise.

ConAgra argued that the policy's general Occurrence definition applies in this case, primarily because it manufactured the tainted peanut butter products in an uninterrupted, continuous production schedule that exceeded seven days in du-

**52.** *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 191 (Del.2009).

**53.** *Phillips Home Builders, Inc. v. Travelers Ins. Co.*, 700 A.2d 127, 129 (Del.1997).

**54.** *Id.*

ration. ConAgra's argument implies that reliance upon Endorsement #3 disaggregates claims that should otherwise be aggregated and defeats coverage rather than enhances it. This interpretation, however, conflicts with the explicit agreement of the parties. ConAgra and Lexington agreed to specific terms—in Endorsement #3—that apply to the precise product liability bodily injury claims that are asserted here. Specifically, those terms dictate that all bodily injury claims arising out of one lot or batch of completed products constitute one Occurrence, and they define one lot or batch as a single seven day production run. They make no exception nor are they subject to any caveat that depends upon the *de facto* production schedule ConAgra decides to pursue. Accepting ConAgra's argument that the general policy definition of Occurrence applies in this case would eviscerate the seven day limitation contained in the Lot or Batch Provision and defeat the method that the parties expressly agreed upon for determining an Occurrence for purposes of product liability claims.

The insurance policy in this case is a general insurance policy. The parties agreed to a general definition of Occurrence that applies in cases of general liability. The parties also agreed to the terms of Endorsement #3, including the Lot or Batch Provision. The very purpose of Endorsement #3 and its Lot or Batch Provision is to allow the parties to zero in on production—specifically, products liability claims. It explicitly changes the definition of Occurrence for purposes of bodily injury claims subject to the Products–Completed Operations Hazard. In cases involving those claims, which include this case, Endorsement #3 intentionally temporally limits the aggregation of claims to those arising out of the same discrete seven day period of production and then subjects

those aggregated claims to an increased retained limit of $5 million.

Considering the vast scope of potential liability that could arise from ConAgra's completed products it produces in continuous manufacturing cycles, imposing these dual limitations—redefining Occurrence to permit aggregation of claims only within distinct seven day production runs and raising the applicable retained limit from $3 million to $5 million—may have been the only way that Lexington could offer insurance coverage at a price ConAgra would pay. Regardless of the motivation underlying the inclusion of these terms in the policy, however, their import is clear. With respect to bodily injury claims arising out of finished products under the Products–Completed Operation Hazard, the insurance policy imposes a $5 million retained limit on each lot or batch, which the policy defines as a discrete production run lasting seven days or less. Unless and until ConAgra satisfies that heightened limit for any of its lots or batches, ConAgra does not trigger Lexington's coverage.

## IV. CONCLUSION

We believe the text of the insurance policy is clear. Consequently, we interpret the text according to its plain meaning. In this case, ConAgra and Lexington used Endorsement #3 to alter the general definition of Occurrence and raise the applicable retained limit in cases of bodily injury claims arising out of the Products–Completed Operation Hazard. Because the peanut butter claims are products liability claims for bodily injury, they fall within the purview of Endorsement #3. Therefore, we believe that the policy requires ConAgra to satisfy a $5 million per seven day production run retained limit with respect to the peanut butter claims before it can trigger Lexington's insurance cover-

age. Because we believe the text is unambiguous and yields this result, and because ConAgra has not asserted that it reached its applicable retained limit, we believe ConAgra has not yet triggered Lexington's coverage and exposure to the tainted peanut butter claims. We would affirm the Superior Court. The majority believes otherwise, and therefore, we respectfully dissent.