IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE FIRST HEALTH SETTLEMENT CLASS, | § § § | No. 498, 2013 |
| Defendant Below- Appellant, | § § § § | Court Below: Superior Court of the State of Delaware in and for New Castle County |
| v. | § § | C.A. No. 09C-09-027 |
| CHARTIS SPECIALITY INSURANCE COMPANY, | § § § § | |
| Plaintiff Below- Appellee. | § § § | |

Submitted: December 3, 2014
Decided: March 6, 2015

Before **STRINE**, Chief Justice, **HOLLAND**, **VALIHURA**, and **VAUGHN**, Justices, **BOUCHARD**,\* Chancellor, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **REVERSED** and **REMANDED**.

Kevin G. Abrams, Esquire, John M. Seaman, Esquire, (*argued*), Steve C. Hough, Esquire, Abrams and Bayliss LLP, Wilmington, Delaware; Somer G. Brown, Esquire, (*argued*), Cox, Cox, Filo, Camel & Wilson LLC, Lake Charles, Louisiana, for Appellant.

Timothy Jay Houseal, Esquire, (*argued*), Jennifer M. Kinkus, Esquire, William E. Gamgort, Esquire, Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware; Matthew J. Fink, Esquire, (*argued*),Charles A. Hafner, Esquire, Nicholaides Fink Thorpe Michaelides Sullivan LLP, Chicago, Illinois, for Appellee.

_____

\* Sitting by designation under Del. Const. art. IV, § 12.

**VAUGHN**, Justice, for the Majority:

Defendant Below/Appellant, The First Health Settlement Class ("The First Health Class"), appeals from an order of the Superior Court granting partial summary judgment in favor of Plaintiff Below/Appellee, Chartis Specialty Insurance Company ("Chartis"). The case arises from a class action filed against First Health Group Corporation ("First Health") and others in the State of Louisiana. In that action, medical service providers alleged that First Health violated notice provisions contained in a Louisiana statute known as the Preferred Provider Organizations Act.[1] The plaintiff class obtained a judgment against First Health. First Health then negotiated and paid a settlement of the judgment.

First Health was insured under an errors and omissions insurance policy issued by Chartis. The policy had a number of exclusions, one of which was an exclusion for "penalties." The issue in this case is whether the amount First Health paid to settle the Louisiana litigation was a "penalty," and, therefore, not a covered loss under the insurance policy. The Superior Court concluded that the amount paid was a "penalty." We have concluded that it was not, and that the policy's exclusion for "penalties" does not apply.

---

[1] The act is also known as the "Any Willing Provider Act."

2

# I. FACTUAL AND PROCEDURAL HISTORY

First Health is a provider of medical service plans, including Preferred Provider Organization ("PPO") networks. Under the PPO network, First Health had agreements with medical providers in Louisiana in which the medical providers agreed to discount rates regarding certain medical services. First Health also entered into agreements with group workers' compensation payers, such as employers, who utilized First Health's discounted PPO rates when paying for workers' compensation services.

By statute, the State of Louisiana has approved PPO networks and their discounted rates, but has imposed certain statutory requirements. One requirement is that the PPO give notice to a medical provider when a discount is to be applied. The notice provisions of the Louisiana statute can be satisfied in either one of two ways. One way is by issuing a benefit card to a patient that the patient can then present to the medical provider. The other way is by issuing a written notice to the medical provider that a certain group purchaser is a PPO participant.

Failure to comply with the notice requirements subjects a PPO to financial consequences under La. R.S. § 40:2203.1(G), which reads as follows:

> Failure to comply with the [notice provisions] of this Section shall subject a group purchaser to damages payable to the provider of double the fair market value of the

medical services provided, but in no event less than the greater of fifty dollars per day of noncompliance or two thousand dollars, together with attorney fees to be determined by the court.[2]

In April 2004, a group of Louisiana health care providers brought a class action against First Health and others in Louisiana state court alleging that First Health had failed to comply with the statutory notice provisions. The action was captioned *Gunderson v. F.A. Richard & Associates, Inc.*[3] (the "*Gunderson* Litigation"). The plaintiff class sought damages from First Health under La. R.S. § 40:2203.1(G). As mentioned, the plaintiffs were successful in obtaining a judgment against First Health.

First Health settled the judgment for the amount of $150,500,000, which included attorneys' fees paid to plaintiff class counsel. As part of the settlement, First Health assigned to the plaintiff class its rights under the insurance policy issued by Chartis. The class is now known as The First Health Settlement Class, the Appellant in the instant case.

On September 9, 2009, Executive Risk Specialty Insurance Company ("Executive Risk"), First Health's primary insurer, filed an action against First Health in the Delaware Superior Court seeking, among other things, declaratory relief that any amount paid by First Health to the plaintiff class in the *Gunderson* Litigation was

---

[2] La. R.S. § 40:2203.1(G).
[3] No. 2004-2417 (14th Jud. Dist. Ct. Parish of Calcasieu).

a penalty under La. R.S. § 40:2203.1(G) and not a covered loss under an insurance policy it had issued to First Health. The Executive Risk policy provided that penalties were excluded from coverage. Executive Risk named as defendants First Health's excess insurers, including Chartis. The First Health Class was subsequently added as a defendant.[4]

The policy that Chartis issued to First Health also excludes penalties. It provides, in pertinent part, as follows:

> "Loss" means Defense Expenses and any monetary amount which an Insured is legally obligated to pay as a result of a Claim. Loss shall include, up to the amount listed in ITEM 3(b) of the Declarations (which sum shall be part of and not in addition to the Limit of Liability stated in ITEM 3(a) of the Declarations), any fines assessed, penalties imposed, or punitive, exemplary or multiplied damages awarded in Claims for Antitrust Activity, but only if such fines, penalties or punitive, exemplary or multiplied damages are insurable under applicable law. This paragraph shall be construed under the applicable law most favorable to the insurability of such fines, penalties, and punitive, exemplary or multiplied damages. Loss shall not include:
>
> (1) Except as expressly set forth above, fines, penalties, taxes or multiplied damages . . . .[5]

While the policy initially excluded punitive or exemplary damages from the

---

[4] Executive Risk and the other insurers, except Chartis, have entered into settlement agreements with The First Health Class.

[5] Appellant's Op. Br. App. at A0366.

definition of Loss, an endorsement amended the Loss definition to specifically include coverage for punitive and exemplary damages.

The First Health Class and Chartis filed cross motions for partial summary judgment. On May 7, 2013, the Superior Court issued its opinion finding that the settlement paid by First Health in the *Gunderson* Litigation was a penalty. It therefore denied The First Health Class' motion and granted Chartis' motion.

When the Superior Court issued its May 7, 2013, opinion, other litigation was occurring in the State of Louisiana in the case of *George Raymond Williams M.D. et al., v. SIF Consultants of Louisiana, Inc., et al.* (the "*Williams* Litigation"). The *Williams* Litigation, like the class action brought in the *Gunderson* Litigation, was a class action in which medical providers alleged that a PPO network failed to comply with the notice provisions of Louisiana's Preferred Provider Organizations Act. The plaintiff class sought damages under La. R.S. § 40:2203.1(G).

Executive Risk, the same insurer that filed this declaratory judgment action, was an insurer of a defendant in that case, CorVel Corporation ("CorVel"). Executive Risk was made a party to the *Williams* Litigation under La. R.S. § 22:1269, which provides that under certain conditions an "injured person . . . shall have a right of direct action against the insurer within the terms and limits of the policy; and, such

action may be brought against the insurer alone."[6]  The Executive Risk policy involved in the *Williams* Litigation also excluded penalties from covered losses.

On July 23, 2011, CorVel agreed to settle the *Williams* Litigation.  Thereafter, the plaintiff class in *Williams* filed a motion for partial judgment against Executive Risk contending that damages under La. R.S. § 40:2203.1(G) were statutory damages and not penalties.  Executive Risk contended, as Chartis does here, that the damages under La. R.S. § 40:2203.1(G) were  penalties.  Because the insurance policy excluded penalties from the definition of Loss, Executive Risk argued that the settlement amount paid by CorVel was not a covered loss.

On July 29, 2013, the Louisiana trial court issued an opinion in the *Williams* Litigation granting the plaintiff class' motion for partial summary judgment and holding that damages under La. R.S. § 40:2203.1(G) are statutory damages, not penalties.[7]  Thus, according to the Louisiana trial court, the insurance policy issued to CorVel covered the amount paid to the plaintiff class in the *Williams* Litigation.

Executive Risk appealed the trial court's decision to the State of Louisiana Court of Appeals for the Third Circuit.  The appellate court affirmed the trial court's judgment.  It also found that damages under La. R.S. § 40:2203.1(G) are statutory

---

[6] La. R.S. § 22:1269.
[7] *Williams v. SIF Consultants of Louisiana, Inc.*, 2013 WL 7330225 (La. Dist. Ct. Jul. 29, 2013).

damages, or damages punitive in nature, but not penalties.[8] Based on these findings, the appellate court concluded that the settlement paid by CorVel was a covered loss under the policy issued by Executive Risk. Executive Risk subsequently settled, and no appeal was taken to the Louisiana Supreme Court from the decision of the appellate court.

On August 23, 2013, the Superior Court entered a final order and judgment. On September 3, 2013, The First Health Class filed a Motion to Alter or Amend the Judgment under Superior Court Rule 59(d), or alternatively, for Relief from the Judgment under Rule 60(b). On September 20, 2013, while the motion was still pending before the Superior Court, The First Health Class filed a notice of appeal in this Court from the May 7, 2013, opinion and August 23, 2013, final order of the Superior Court.

The Superior Court denied The First Health Class' motions on September 25, 2013. The First Health Class filed an amended notice of appeal on October 3, 2013. On December 10, 2013, Chartis filed a Motion to Dismiss the appeal on the ground that The First Health Class failed to file a timely notice of appeal. On January 6, 2014, this Court denied the motion without prejudice.

---

[8] *Williams v. SIF Consultants of Louisiana, Inc.*, 133 So.3d 707 (La. Ct. App. 2014), *reh'g denied* (Apr. 9, 2014).

## II. DISCUSSION

Chartis has renewed its Motion to Dismiss. It relies upon an order issued by this Court in *McElroy v. Shell Petroleum, Inc.*[9] In *McElroy*, the Court of Chancery entered an order on June 18, 1992, and McElroy filed a timely motion for reargument. On July 15, 1992, while the motion for reargument was still pending in the Court of Chancery, McElroy filed a notice of appeal in this Court. On July 23, 1992, this Court directed McElroy to file an amended notice of appeal to comply with Rule 7 and Official Form A. On July 29, 1992, McElroy filed a first amended notice of appeal. At that time, the motion for reargument was still pending in the Court of Chancery. On August 19, 1992, after the Court of Chancery denied the motion for reargument and its June 18, 1992, order had become final, McElroy filed a second amended notice of appeal. This Court concluded in *McElroy* that the first notice of appeal was filed prematurely because the motion for reargument was still pending in the Court of Chancery, that both the first amended notice of appeal and the second amended notice of appeal related back to the original, prematurely filed notice of appeal, and that no effective notice of appeal had been filed. Accordingly, we dismissed the appeal.[10]

---

[9] 1992 WL 279112 (Del. Sep. 2, 1992).

[10] On the same day that McElroy filed his second amended notice of appeal, he filed a new notice of appeal, which was given a new appeal number. He was able to proceed with his appeal under the

9

We are not persuaded that *McElroy* should be followed here. In *Tomasetti v. Wilmington Sav. Fund Soc'y*, this Court held that a timely filed Motion for New Trial or a Motion for Reargument in a civil case suspends the finality of the trial court judgment and tolls the time for filing an appeal.[11] Under *Tomasetti*, a notice of appeal filed in this Court before such post-trial motions are decided in the trial court fails to confer jurisdiction upon this Court and is a nullity. A notice of appeal filed in a timely manner after post-trial motions have been decided in the trial court is the filing that confers jurisdiction in this Court, and it cannot relate back to an ineffective notice of appeal that failed to confer jurisdiction upon the Court. The same rule applies to a Motion to Alter or Amend the Judgment filed under Superior Court Civil Rule 59(d). We find that the notice of appeal filed on October 3, 2013, after the Superior Court denied The First Health Class' Motion to Alter or Amend the Judgment, was timely and effective. Accordingly, we will consider the merits of the Appellant's claim here.

We review a grant of summary judgment *de novo*.[12] Interpretation of a statute is a question of law, which we also review *de novo*.[13]

---

new number.

[11] 672 A.2d 61 (Del. 1996).

[12] *Kelty v. State Farm Mut. Auto. Ins. Co.*, 73 A.3d 926, 929 (Del. 2013) (citing *E. Sav. Bank, FSB v. CACH, LLC*, 55 A.3d 344, 347 (Del. 2012)).

[13] *Id.*

10

"Comity permits one state to give effect to the laws of a sister state, not out of obligation, but out of respect and deference."[14] We have acknowledged that "important and novel issues of other sovereigns are best determined by their courts where practicable."[15] Where a foreign statute has been interpreted by courts of the state of its origin, such interpretation should be followed in other states where the statute is applied.[16] Pursuant to the doctrine of comity, the courts of a sister state should adopt the decision of the highest tribunal of the enacting state concerning construction of the statute.[17]

The First Health Class argues that, in accordance with the doctrine of comity, we should show deference to the Court of Appeals of Louisiana, and adopt its interpretation of La. R.S. § 40:2203.1(G). We agree. The Louisiana appellate court considered the same Louisiana statute and analyzed almost identical insurance policy

---

[14] *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214 (Del. 1991) (citing 16 Am. Jur. 2d, *Conflict of Laws* § 10, at 28 (1979)).

[15] *Martinez v. E.I. DuPont de Nemours and Co., Inc.*, 86 A.3d 1102, 1110 (Del. 2014).

[16] 2 Sutherland Statutory Construction § 37:3 (7th ed.) (internal citations omitted). *See, e.g.*, *Kahn v. Pony Express Courier Corp.*, 20 P.3d 837, 849 (Or. Ct. App. 2001) (examining decisions of the Montana appellate courts interpreting and applying a Montana statute to determine its intent); *Peterson v. Ely*, 569 P.2d 1059 (Or. 1977) (construing Washington statute in accordance with decisions of Washington Supreme Court); *People ex rel. Shults v. Lombard*, 398 N.Y.S.2d 932 (Co. Ct. 1977) ("The decision of the foreign court of last resort is controlling on the question to be decided by a court of this State, and this is especially true when a question arises with respect to the statute and constitution of the foreign state.") (internal citations omitted); *King v. Klemp*, 57 A.2d 530, 533 (N.J. Ch. 1947) ("[W]here the construction of a foreign statute is involved, our courts will accept as controlling the interpretation placed thereon by the courts of that state.").

[17] *See* 2 Sutherland Statutory Construction § 37:3 (7th ed.) (internal citations omitted).

language as that involved in this case. Because the Louisiana appellate court in the *Williams* Litigation is the highest Louisiana appellate court to construe La. R.S. § 40:2203.1(G), we adopt its reasonable interpretation as our own. We find that La. R.S. § 40:2203.1(G) provides for statutory damages, not penalties. Thus, we find that the amount that First Health paid to settle the *Gunderson* Litigation, including attorneys' fees, is not excluded from the definition of "Loss" by the provision that excludes "penalties."

In our view, the Dissent is based upon several flawed premises. The Dissent maintains that the Superior Court rendered its decision well before the Louisiana trial court issued its ruling. In other words, it takes to task the District Court of Louisiana for the 27th Judicial District for not deferring to the Delaware Superior Court. The fact is that the litigation in Louisiana had been in progress for many years prior to the filing of the Delaware suit.[18] The center of this litigation has been in Louisiana and the dispute underlying the Delaware declaratory action arises out of the Louisiana Litigation.

---

[18] As mentioned, the *Gunderson* Litigation was brought against First Health in 2004. In addition, in 2004 and 2005, CorVel and Lake Charles Memorial Hosital ("LCMH") were embroiled in legal action in Louisiana. On December 22, 2006, LCMH instituted a putative class arbitration against CorVel (*Sw. La. Hosp. Ass'n. d/b/a Lake Charles Mem'l Hosp. v. CorVel*). LCMH claimed that CorVel violated Louisiana law, and sought coverage from an insurance policy issued by Homeland Insurance Company of New York ("Homeland"), which also contained an exclusion for penalties. On September 30, 2009, the *Williams* Litigation was filed. The lawsuit claimed the same violation of Louisiana law as claimed by LCMH against CorVel (and against Homeland).

12

As early as 2007, the Louisiana trial court in the *Gunderson* Litigation issued a ruling from the bench that had negative implications for insurance carriers. The trial court stated the following:

> This Court notes from a very basic standpoint that [the Louisiana statute § 40:2203.1(G)] makes no mention of fines or penalties . . . I believe from a very basic standpoint that damages are covered by the Columbia policy. No one is arguing that point.
>
> Now, as to whether or not the quote, "damages" being sought by the plaintiffs are in fact civil fines and penalties this Court is of the position that they are not.[19]

Moreover, there is very little connection to the State of Delaware in this litigation. The only nexus with the State of Delaware is First Health's situs of incorporation. The First Health Class is a group of Louisiana medical providers. First Health's principal place of business is Illinois. Chartis is an Illinois corporation, with its principal place of business in New York. Executive Risk is a Connecticut corporation, with its principal place of business in New Jersey.

The connection this litigation has with the State of Louisiana is much stronger. This litigation first began in 2004 in the *Gunderson* Litigation. Another class action began about a decade ago when Lake Charles Memorial Hospital filed suit against

---

[19] *Gunderson v. F.A. Richard & Associates, Inc.*, No. 2004-2417 (14th Jud. Dist. Ct., Parish of Calcasieu, La. Jul. 20, 2007), *aff'd*, 44 So.3d 779 (La. App. 2010); Appellant's Op. Br. App. at A987.

CorVel in Louisiana.[20] The cases alleged a violation of Louisiana law, which by its own terms has no application outside that state's boundaries.[21] Moreover, the parties agree that there is no difference between Delaware and Louisiana regarding construing contracts. For example, they agree that all potentially applicable state laws provide that coverage provisions should be construed broadly and exclusions should be construed narrowly.

The Dissent maintains that Delaware law applies notwithstanding the absence of a choice of law provision in the insurance policy. While the parties may have agreed for purposes of this appeal that Delaware law applies to the construction of the policy, they disagree on which state's law controls the central question of how to characterize the judgment obtained in the *Gunderson* Litigation.

The Appellants contend that the Louisiana statute controls how the judgment is characterized. The Delaware Superior Court agreed as evidenced by its statement that "while the Court will apply Delaware law to interpret the insurance contracts,

---

[20] *See CorVel Corp. v. Sw. La. Hosp. Ass'n*, 2007 WL 594904 (W.D. La. Feb. 21, 2007) (ordering the parties to enter arbitration for statutory claims under La. R.S. § 40:2203.1, and discussing the filing of *Sw. La. Hosp. Ass'n. d/b/a Lake Charles Mem'l Hosp. v. CorVel*).
[21] La. R.S. § 40:2203.1(A) ("Except as otherwise provided in this Subsection, the requirements of this Section shall apply to all preferred provider organization agreements that are applicable to medical services rendered in this state and to group purchasers as defined in this Part. The provisions of this Section shall not apply to a group purchaser when providing health benefits through its own network or direct provider agreements or to such agreements of a group purchaser.").

Louisiana law will be applied regarding the penalty issue, as this Court must examine a Louisiana Statute."[22]  However, the Superior Court erred when it then applied common law principles in answering this question, rather than Louisiana's civil law approach that was foreshadowed by the *Gunderson* trial court's bench ruling.  Under civil law, priority is given to statutes and codes over common law jurisprudence.[23]  "Civil law codes provide the core of the law-general principles[, which] are systematically and exhaustively exposed in codes[,] and particular statutes complete them."[24]  Quite simply, in Louisiana, if the statute does not characterize the damage award entered as a "penalty," then it is not a "penalty" under Louisiana law.[25]

The Dissent refuses to accept the Louisiana court's construction of its own statute.  It rejects Louisiana's civil law approach as tautological, and instead, applies common law interpretation to the Louisiana statute to determine whether damages under La. R.S. § 40:2203.1(G) constitute "penalties."  We submit that we should defer to the Louisiana court's civil law approach in the construction of its own statute.

Finally, we acknowledge that the Superior Court did not have the benefit of the

---

[22] *Homeland Ins. Co. v. CorVel Corp.*, 2013 WL 3937022, at *10 (Del. Super. Jun. 13, 2013).
[23] *See generally* William Tetley, *Mixed Jurisdictions: Common Law v. Civil Law (Codified and Uncodified)*, 60 La. L. Rev. 677, 701-05 (2000).
[24] *Id.* at 703 (internal citations omitted).
[25] *See Williams v. SIF Consultants of Louisiana, Inc.*, 133 So.3d 707, 714 (La. Ct. App. 2014) ("The language of La. R.S. § 40:2203.01 denotes that a violator is subject to pay 'damages' and includes no language regarding penalties.").

Louisiana trial and appellate court's decisions in the *Williams* Litigation when it rendered its May 7, 2013, opinion and order. But given our *de novo* review, we will exercise comity in favor of our sister state, Louisiana, and, accordingly, hold that Louisiana's interpretation of its own statute is the correct interpretation.

### III.  CONCLUSION

Accordingly, the matter is **REVERSED** and **REMANDED** for further proceedings consistent with this Opinion.

**STRINE**, Chief Justice, dissenting, with **BOUCHARD**, Chancellor, joining:

We share the Majority Opinion's desire to respect principles of comity and to avoid conflicting rulings. We respectfully dissent, however, from the Majority Opinion's view that by reversing the Superior Court's careful determination of the insurance coverage issues properly before it, our Court would be failing to accord comity to our esteemed judicial colleagues in Louisiana. The record is clear that the Superior Court rendered its decision on coverage *well before* the Louisiana trial court issued its ruling on that same issue.[26] And unlike the Louisiana Court or the Majority Opinion, the Superior Court recognized that the proper analysis to determine coverage under a contract starts with the language of the contract itself. This case thus does not depend principally on the interpretation of a Louisiana statute, but instead turns on the meaning of a contract that the parties to this appeal do not dispute should be interpreted based on Delaware contract law principles.

The issues at stake in this case and its companion, *CorVel v. Homeland*, make little sense without understanding the full context behind this appeal. The underlying claims for which insurance coverage was sought arise of the so-called PPO industry.

---

[26] Indeed, the Louisiana trial court's ruling referenced the earlier Delaware decision. *Compare Executive Risk Specialty Ins. Co. v. First Health Group Corp.*, 2013 WL 1908664 (Del. Super. May 7, 2013) [hereinafter Superior Court Opinion], *and Homeland Ins. Co. and Executive Risk Specialty Ins. Co. v. CorVel Corp.*, 2013 WL 3937022 (Del. Super. June 13, 2013), *with Williams v. SIF Consultants of Louisiana, Inc.*, 2013 WL 7330225 (La. Dist. Ct. July 29, 2013).

17

A PPO, short for Preferred Provider Organization, essentially acts as an intermediary between health insurance companies and medical providers, including hospitals and individual doctors. The PPO creates a network of providers who agree to receive a reduced payment for treating patients covered by the insurers.

This case and CorVel's arose from litigation brought by multiple groups of medical providers in Louisiana alleging that a number of PPO owners and operators, including First Health and CorVel, were violating La. R.S. § 40:2203.1., the "PPO Act," by improperly discounting payments for medical services without providing adequate notice to providers. The Act requires that before PPOs can discount payments to health care providers, either the patient must present a benefit card identifying the PPO at the time of service or the provider must agree in writing to receive the discounted rate.[27] The provider plaintiffs alleged that the PPOs had failed to provide the required notice for services provided to workers' compensation patients. The plaintiffs sought the remedies established in Section G of the Act: "damages payable to the provider of double the fair market value of the medical services provided, but in no event less than the greater of fifty dollars per day of noncompliance or two thousand dollars, together with attorney fees to be determined

---

[27] La. R.S. § 40:2203.1(B)-(C).

by the court."[28]

The cases now before us are one step removed from those underlying claims. They focus on a different but related issue; namely, whether the PPOs' insurers owe the PPOs reimbursement for the medical providers' claims.

A class of medical service providers brought suit against a group of PPO owners and operators, including First Health, in 2004.[29] First Health eventually settled with that plaintiff class (the "Settlement Class") for $150.5 million and an assignment of its insurance rights.[30] That is, the PPO defendant paid money and then gave the medical provider plaintiffs the right to go directly against their insurers as an assignee. As a result, First Health is no longer involved in this litigation.

Separately, CorVel faced legal action for allegedly discounting payments in violation of the PPO Act from two sets of providers. First, Lake Charles Memorial Hospital brought a class arbitration against CorVel in 2006. While that case was pending, another plaintiff, George Raymond *Williams*, M.D., sued PPO owners and operators on behalf of the same class of providers in a Louisiana trial court (the

---

[28] La. R.S. § 40:2203.1(G).
[29]*Gunderson v. F.A. Richard & Assoc.*, 2005 WL 5468586 (La. Dist. Ct., June 23, 2005).
[30] *See Gunderson v. F.A. Richard & Assoc.*, No. 2004-2417 (14th Jud. D.C., Parish of Calcasieu, State of La., May 27, 2011).

"*Williams* litigation").[31]  CorVel was eventually added as a defendant to that suit.

Under Louisiana law, plaintiffs can pursue claims directly against insurers in certain

circumstances.[32]  Accordingly, CorVel's two insurers, Homeland and Executive Risk,

were also named as defendants.  Because the Lake Charles arbitration and the

*Williams* litigation involved identical claims on behalf of the same class of providers

(the "Provider Plaintiff Class"), CorVel was able to resolve both actions with a global

settlement for $9 million and an assignment of its insurance rights, which the

Louisiana District Court approved in November 2011.  But both Homeland and

Executive Risk remained parties to the litigation.  Put plainly, what CorVel did was

to pay $9 million and then unleash the Provider Plaintiff Class to proceed directly

against its insurers, Homeland and Executive Risk, as if the Provider Plaintiff Class

had the same contractual rights as an insured as CorVel.

Both First Health and CorVel had multiple layers of insurance coverage under

Errors & Omissions policies at the time of the alleged wrongdoing that they contend

should cover the underlying claims.  As noted, CorVel's coverage was provided by

Executive Risk and Homeland; First Health's by four different companies, including

---

[31] *George Raymond Williams, MD. v. SIF Consultants of Louisiana, Inc.*, Dkt. No. 09-C-5244-C, 27th Judicial District Court, Parish of St. Landry.

[32] *See* La. R.S. § 22:1269(B)(1).  That is, Louisiana law subjects an insurer who has no contractual relationship with the tort plaintiffs to a lawsuit based on the insurance company's policy with the tort defendant.

Chartis. In September 2009, one of First Health's insurers filed suit in the Delaware Superior Court, seeking a declaration that it had no duty to indemnify First Health under its policy for any claims related to the Louisiana litigation. After First Health settled that litigation, in part by unleashing the plaintiff class to sue its insurers under an assignment, the Settlement Class was added to the Delaware action against First Health as the real party in interest.

The Settlement Class moved for partial summary judgment on the issue of coverage on April 3, 2012, contending that the underlying claims constituted damages, which were covered under the contract. Chartis agreed that there were no material issues of fact to be decided, and cross-moved for partial summary judgment, contending that the claims were instead for penalties, which were excluded.[33] The Superior Court held a hearing on the motions on June 13, 2012, and issued an opinion denying the Settlement Class's motion and granting Chartis' motion for partial summary judgment on May 7, 2013. After conducting a thorough analysis of the insurance contract at issue, the Superior Court found that the policies were unambiguous, and the providers' claims under the PPO Act constituted penalties, not

---

[33] At that point, Chartis was one of three defendant insurance companies, but the other two eventually settled with the Settlement Class.

21

damages, and were therefore not covered.[34]

Litigation between CorVel and its insurers moved along a parallel track. In January 2011, Homeland brought a claim in the Delaware Superior Court seeking a declaration that the underlying claims for violations of the PPO Act were not insurable losses under its policy because they were penalties, not damages. Executive Risk was granted leave to intervene. Both insurers moved for partial summary judgment, arguing that there were no material facts in dispute.[35] Unlike in First Health's case, CorVel opposed both motions and argued that there were material facts remaining to be decided. Focusing on the terms used by the PPO Act rather than the language of the policies at issue, CorVel argued that under Louisiana law, the medical providers' claimed remedies were damages, not penalties. But CorVel claimed that, at a minimum, the policy exclusions were ambiguous, and thus summary judgment was inappropriate. The Superior Court heard arguments on January 31, 2013, and issued its opinion granting the insurance companies' motions on June 13. Just as in First Health's case, the court carefully analyzed the relevant insurance policies and determined they were unambiguous in excluding the underlying claims as penalties.[36]

---

[34] *See* Superior Court Opinion.

[35] Executive Risk moved for summary judgment "on the issues of penalty, restitution, and contract" on Aug. 29, 2012; Homeland moved for partial summary judgment in the same action on the same day.

[36] *Homeland Ins. Co. and Executive Risk Specialty Ins. Co. v. CorVel Corp.*, 2013 WL 3937022 (Del. Super. June 13, 2013).

22

The Settlement Class and CorVel then both appealed to this Court.

Back in Louisiana, on May 24, 2014, after the Delaware Superior Court had issued its decision in First Health's case, but while the decision in CorVel's case was pending, the Provider Plaintiff Class moved for partial summary judgment against Executive Risk in the *Williams* litigation. Although technically the Provider Plaintiff Class is a separate party from CorVel, they share at least some of the same attorneys, and there is no question that they have acted in coordination throughout this litigation. Likewise, CorVel and the First Health Settlement Class have the same attorneys and their briefing on appeal to this Court was substantively identical.

After the Delaware Superior Court issued its June 13 decision in CorVel's case, granting summary judgment to Executive Risk and Homeland, the Louisiana trial court in *Williams* held a hearing on the Provider Plaintiff Class' motion on June 28. Rather than defer to the Delaware Superior Court's well-reasoned rulings on the identical coverage issues, the Louisiana court granted the motion for summary judgment on July 29, holding that under the PPO Act, the remedies available to providers were damages, not penalties. The Louisiana Third Circuit Court of Appeal affirmed the trial court's ruling on February 26, 2014.[37] At that point, Executive Risk

---

[37] *Williams v. SIF Consultants of Louisiana, Inc.*, 133 So.3d 707 (La. Ct. App. 2014). The Louisiana Appeals Court's decision references the earlier Delaware ruling as evidence that the plaintiff class' motion for partial summary judgment was ripe for adjudication, but does not otherwise address

settled with the Provider Plaintiff Class and was dismissed from CorVel's appeal then pending before this Court.

Without quibbling in any way with the Louisiana Court's description of the Louisiana statute that apparently motivated its decision on the relevant coverage issues, we still find it impossible to reverse the Delaware Superior Court in the appeal pending before this Court. The reasons for that are simple: the Superior Court did not ignore principles of comity or commit any error of contract law. As to the first issue—comity—the Superior Court considered an issue properly put to it in advance of any requested ruling on that issue by the Louisiana trial court. As to the second, the Superior Court did not understand the Louisiana statute to operate any differently than the *Williams* court did. But the Superior Court, unlike the *Williams* court or the Majority Opinion, gave meaning and effect to the core contractual terms the parties had agreed to. The Superior Court's legal conclusions on that score were well-supported by respected authority,[38] applying relevant principles of contract

---

Executive Risk's claim that the Louisiana trial court's ruling directly contradicted a previous judgment that should have had preclusive effect. *See id*.

[38] *See, e.g.*, *Katz v. Oak Industries*, 508 A.2d 873, 880 (Del. Ch. 1986) (quoting Corbin on Contracts (Kaufman Supp. 1984), § 570) ("If the purpose of contract law is to enforce the reasonable expectations of parties induced by promises, then at some point it becomes necessary for courts to look to the substance rather than to the form of the agreement, and to hold that substance controls over form.").

interpretation that are embraced by our courts and by most jurisdictions.[39]

The Superior Court's analysis was faithful to the text of La. R.S. § 40:2203.1, but properly recognized that the label the Louisiana statute used did not determine whether the substance of what the underlying medical provider claimants obtained were "damages" within the terms of the insurance contract—which would be covered—or "penalties"—which would not. The meaning of terms in insurance policies like the one involved here have to govern the operation of companies doing business in many jurisdictions. As a result, the claims that arise under various jurisdictions must be analyzed to determine whether they fall within the insurance contract's coverage or within excluded categories. That requirement of proper contract analysis does not change, regardless of whether the jurisdiction takes a common law or civil law approach in interpreting its statutes.

In conducting the appropriate contractual analysis, it is important that the nature of the underlying claim and the law governing it be understood. But the dispositive question of law is what the contractual terms mean, which here the parties do not dispute is governed by Delaware, not Louisiana, law.[40] In other words, the

---

[39] *See, e.g.*, *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 68 (Del. 2011) ("This Court has adopted traditional principles of contract interpretation.").

[40] The insurance contract at issue did not include a choice of law clause. Although there were several plausible contenders for which state's law should govern the interpretation of the contract, the Superior Court found that there was no conflict between any of the possible state laws and therefore applied the law of the forum state, Delaware. The Settlement Class did not challenge that

25

issue is not what a state's particular statute calls the remedy, or how that state's courts would interpret the statute; the question is whether the remedy afforded by the statute in fact amounts to covered damages or excluded penalties as those terms are used in the parties' contract. In all controversies arising under the policy, regardless of the location of the underlying claim, the contract definition governs. The *Williams* decision ignored that reality and made no attempt to give any weight to the contract or even consider the Superior Court's careful ruling on that subject. In doing so, the Louisiana Court failed to give comity to our state.[41]

The Majority Opinion, like the *Williams* court's decision, does not point to any errors in the Superior Court's analysis of the contract at issue. That is because, as the Superior Court found, the plain language in the contract is unambiguous. First Health's policy with Chartis[42] defines "loss" as:

> Defense Expenses and any monetary amount which an Insured is legally obligated to pay as a result of a Claim. Loss shall include . . . any punitive or exemplary damages where insurable

---

determination on appeal. We note that it would aid in our resolution of coverage issues, which are frequently before this Court, if insurance contracts more routinely included choice of law provisions so that the contracting parties themselves could decide upfront whose law should govern

[41] *See, e.g.*, Majority Opinion at 9 (quoting *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214 (Del. 1991) ("Comity permits one state to give effect to the laws of a sister state, not out of obligation, but out of respect and deference.").

[42] First Health's policy with Chartis is an "excess" policy to its Errors & Omissions policy with Executive Risk, and it therefore incorporates the same "terms, conditions, exclusions and limitations" of the original, including the definition of "loss." The quoted definition is therefore from the Executive Risk policy. App. to First Health Opening Br. at 441.

under applicable law and any fines assessed, penalties imposed, or punitive, exemplary or multiplied damages awarded in Claims for Antitrust Activity. . . . ***Loss shall not include***: except as expressly set forth above, fines, ***penalties***, taxes or multiplied damages.[43]

The policy thus makes clear that penalties are not covered, unless they are penalties related to "Antitrust Activity."[44] The Settlement Class' arguments about the proper way to interpret insurance coverage or exclusions of coverage are therefore irrelevant; the only relevant question is whether the underlying claims are for penalties.

As the Superior Court properly determined, when the language in a contract is "clear and unambiguous," we should give it "its ordinary and usual meaning."[45] Black's Law Dictionary[46] defines penalty as "a sum of money exacted as punishment for either a wrong to the state or a civil wrong (as distinguished from compensation for the injured party's loss). Though [usually] for crimes, penalties are also sometimes imposed for civil wrongs."[47] A civil penalty is defined as a "fine assessed

---

[43] App. to First Health Opening Br. at 342 (original policy); 366 (Endorsement No. 7, amending definition of "loss" to include punitive damages) (emphasis added).

[44] App. to First Health Opening Br. at 342 (original policy); 366 (Endorsement No. 7, amending definition of "loss" to include punitive damages) (emphasis added).

[45] *See O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288 (Del. 2001).

[46] As the Superior Court noted, dictionaries are an appropriate aid in discerning ordinary meaning. *See* Superior Court Opinion at *8 (citing *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006)) ("It is well-settled in Delaware that, in ascertaining the meaning of words not defined in a contract, courts 'look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.'").

[47] Black's Law Dictionary 562 (4th Pocket Ed. 2011).

for a violation of a statute or regulation." A statutory penalty is a "penalty imposed for a statutory violation; [especially], a penalty imposing automatic liability on a wrongdoer for violation of a statute's terms without reference to any actual damages suffered."[48] By contrast, damages are defined as "money claimed by, or ordered to be paid to, a person as compensation for loss or injury."[49] In the analogous contract law context, this Court has defined "penalty" as "a sum . . . that serves as a punishment for default, rather than a measure of compensation for its breach. In other words, it is an agreement to pay a stipulated sum upon breach, irrespective of the damage sustained."[50]

Here, it is not disputed that the remedy scheme under the PPO Act bears no relationship to any actual damages suffered by the medical provider plaintiffs. Indeed, the Act itself makes no effort to tie the remedy to actual losses; the "damages payable to the provider" are "double the fair market value of the medical services provided,"[51] not, for example, double the sum of the improper discount. The statute unambiguously imposes "automatic liability on a wrongdoer for violation of a statute's terms without reference to any actual damages suffered,"[52] or the dictionary

---

[48] *Id.*

[49] *Id.* at 195.

[50] *Delaware Bay Surgical Services, P.C. v. Swier*, 900 A.2d 646, 650 (Del. 2006) (quoting *S.H. Deliveries v. TriState Courier & Carriage*, 1997 WL 817883, at *2 (Del. May 21, 1997)).

[51] La. R.S. 40:2203.1(G) (emphasis added).

[52] *Id.*

28

definition of a statutory penalty.

In making its determination of coverage based on the contract at issue in this case, the Superior Court was respectful of Louisiana authority, including the Louisiana Supreme Court and the U.S. Court of Appeals for the Fifth Circuit,[53] and its understanding of the statute accords with how other courts in Louisiana have viewed the remedies available.[54] But contrary to the Majority Opinion, the Superior Court did not rely on these cases to interpret the statute as a matter of common law; rather, it cited Louisiana precedent as evidence to support its understanding of how the statute operated and whether the statute imposed penalties within the meaning of the term used in the parties' contract. That is, what the Superior Court properly did was to interpret an insurance contract's language, using traditional tools of contract interpretation. That was the judicial task the case assigned it. As the Superior Court found by reference to established authority,[55] the amount of damages set forth in the

---

[53] *See, e.g.*, Superior Court Opinion at *10 (citing previous Louisiana decisions referring to the remedies under the statute as penalties).

[54] *See, e.g.*, *Gunderson v. F.A. Richard & Assoc.*, 44 So.3d 779 (La. Ct. App. 2010); *Gunderson v. F.A. Richard & Assoc.*, 40 So.3d 418 (La. Ct. App. 2010) (characterizing the remedies under the PPO Act as "penalties"); *see also Cent. La. Ambulatory Surgical Ctr., Inv. v. Rapides Parish Sch. Bd.*, 68 So.3d 1041 (La. Ct. App. 2010) (same); *Touro Infirmary v. Am. Maritime Officer*, 24 So.3d 948 (La. Ct. App. 2009) (same); *see also Indian Harbor Ins. Co. v. Bestcomp, Inc.*, 2010 WL 5471005 (E.D. La. Nov. 12, 2010), *aff'd*, 452 F. App'x 560 (5th Cir. 2011) ("damages under section 40.2203.1(G) are excluded from the definition of damages under the policy . . . because the damages more than compensate an injured party for losses incurred due to lack of notice.").

[55] *See* Superior Court Opinion at *9 (citing Black's Law Dictionary 1247 (9th Ed. 2009), and *Landis v. Marc Realty*, 919 N.E.2d 300, 307 (Ill. 2009)).

statute bears no relationship to the harm suffered by any provider and thus was not of the kind considered "remedies" in the normal sense in which parties use term in contracts. Thus, the Superior Court did not rely on the fact that the Act awards remedies in a manner consistent with what other Louisiana courts have historically termed to be penalties, including in an important Louisiana Supreme Court case cited by the *Williams* court,[56] but instead noted that reality to corroborate its own correct reading of the Louisiana statute in relation to the parties' contract.

Had the Louisiana trial court itself showed comity by staying its hand after the Delaware Superior Court made the first ruling on the coverage issue and letting this case run its course to finality, the conflict the Majority Opinion is trying to avoid would not have arisen in the first instance. Because the jurisdiction of our Superior Court was properly invoked, and the Superior Court issued its ruling first, the Provider Plaintiff Class' decision to pursue a new ruling on that same issue in another forum and the decision of the Louisiana courts to issue that ruling has caused the current logjam and any awkward comity issue that has arisen as a result. The party that fairly prevailed on its motion for summary judgment has now lost all benefit from

---

[56] *See Williams v. SIF Consultants of Louisiana, Inc.*, 2013 WL 7330225 (La. Dist. Ct. July 29, 2013) (citing *International Harvester Credit Corporation v. Seale*, 518 So.2d 1039, 1042 (La. 1988) (describing legislative intent to award penalty or punitive damages "by either denoting the award a 'penalty,' modifying the term 'damages' with such language as 'punitive' or 'exemplary,' or *specifically awarding an amount in excess of the claimant's losses*") (emphasis added)).

its trial court victory, and will receive no recompense from the defendant for its costs in obtaining that victory or for litigating this appeal. Those costs have been sunk for no purpose.

Moreover, by reversing on the grounds of comity to the Louisiana court's decision as to Executive Risk, we are subjecting Chartis to the additional costs of litigating the issues anew in Louisiana even though it was not even a party to the *Williams* litigation. When Executive Risk lost at the trial court and at the first appellate level in Louisiana, it settled with the Provider Plaintiff Class and left the decision in *Williams* unappealable.[57] But the ruling that the Provider Plaintiff Class obtained in that action should not run against Chartis.[58]

Attempting to justify the Louisiana trial court's decision to render a ruling on the coverage issues nearly three months after the Superior Court issued its opinion in this case, the Majority Opinion asserts that litigation involving First Health had been in progress in Louisiana many years before the Delaware suit was filed against it. The fact of the matter, however, is that Chartis is not a party in the underlying Louisiana litigation. This suit was brought in the Delaware Superior Court in

---

[57] *See* Joint Motion and Order of Dismissal, *Williams v. SIF Consultants of Louisiana, Inc.*, No. 09-C-5244-C, 27th Jud. District Court, Parish of St. Landry, La. (July 22, 2014).

[58] *See* Charles Alan Wright, et al., 18 Fed. Prac. & Proc. Juris. § 4402 (2d ed.) (a non-party who was not fairly represented in a proceeding cannot justly be bound by principles of claim or issue preclusion).

31

September 2009, well before First Health settled with the Settlement Class and assigned its rights to any insurance proceeds. Even in the related *Williams* litigation in Louisiana, Homeland was not named as a party until March 24, 2011—more than two months after it filed suit in the Delaware Superior Court on January 10, 2011. The principals may have been embroiled in litigation in Louisiana many years earlier, but the record plainly shows that the coverage issues under Chartis' policy were only ever put in issue in Delaware.

Although we respect and share the desire expressed in the Majority Opinion to avoid inconsistent rulings, we cannot embrace its solution. In our view, this is a situation in which our Superior Court did nothing wrong, but another state's courts' failure to show comity to our courts has unnecessarily caused the potential for inconsistent rulings and inefficiency. That might be a rational reason to stand down, as the Majority Opinion has concluded, but it is demonstrably unfair to Chartis. At a minimum, Chartis, as the party who has been victimized by the gamesmanship of an unrelated party, should be reimbursed for its attorneys' fees and costs in obtaining a fair victory in our Superior Court and then having its victory taken away, not by a traditional reversal on the merits on appeal, but because this litigation had been rendered useless by collateral litigation to which this Court has now decided to defer. That compensation should include Chartis's fees and costs spent arguing this appeal.

We also hope for the sake of Chartis that our judicial colleagues in Louisiana will look favorably upon Chartis's right to have the important coverage issues it raised decided on the merits based on what its contract states.

For all these reasons, we respectfully dissent.