IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE ALEXION PHARMACEUTICALS, INC. INSURANCE APPEALS | § § § § § § § § § § | No. 154, 2024 No. 157, 2024<br><br>Court Below: Superior Court of the State of Delaware<br><br>C.A. No. N22C-10-340 |

Submitted: November 6, 2024
Decided: February 4, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **REVERSED**.

Garrett B. Moritz, Esquire, R. Garrett Rice, Esquire, A. Gage Whirley, Esquire, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Marc S. Casarino, Esquire, KENNEDYS CMK LLP, Wilmington, Delaware *for Defendant Below/ Appellant Endurance Assurance Corporation*.

John C. Phillips, Jr., Esquire, David A. Bilson, Esquire, PHILLIPS MCLAUGHLIN & HALL P.A., Wilmington, Delaware; James Sandnes, Esquire, Sarah F. Voutyras, Esquire, SKARZYNSKI MARICK & BLACK LLP, New York, New York *for Defendant Below/Appellant Swiss Re Corporate Solutions America Insurance Corporation f/k/a North American Specialty Insurance Company*.

Bruce W. McCullough, Esquire, BODELL BOVÉ, LLC, Wilmington, Delaware; Agelo L. Reppas, Esquire (*argued*), Brian J. Watson, Esquire, BATESCAREY LLP, Chicago, Illinois *for Defendant Below/Appellant Navigators Insurance Company*.

Daniel M. Silver, Esquire, Benjamin A. Smyth, Esquire, MCCARTER & ENGLISH LLP, Wilmington, Delaware; Robin L. Cohen, Esquire, Cynthia M. Jordano, Esquire (*argued*), Orrie Levy, Esquire, David J. Matulewicz-Crowley, Esquire, COHEN ZIFFER FRENCHMAN & MCKENNA LLP, New York, New York *for Plaintiff Below/Appellee Alexion Pharmaceuticals, Inc.*

**SEITZ**, Chief Justice:

In this insurance coverage dispute, the issue on appeal is whether a Securities and Exchange Commission investigation, disclosed to its insurers by Alexion Pharmaceuticals, Inc., is related to a later securities class action brought against the company and others. If related, the securities class action is covered by Alexion's first insurance tower. If not, it is covered by the second tower. Applying the "meaningful linkage" standard, the Superior Court found that the two were unrelated and placed the securities class action coverage in the second insurance tower. We find, however, that the securities class action – in the words of the policy – arose out of the circumstances disclosed by Alexion to its first tower insurers. Coverage should have been placed in the first tower.

I.

A.

The facts are largely undisputed. Alexion Pharmaceuticals, Inc. develops therapies for people living with rare disorders. Alexion was insured under two claims-made director and officer ("D&O") liability insurance programs covering different periods. The first program provided $85 million of coverage for claims made between June 27, 2014 and June 27, 2015 ("Tower 1"). The second program provided $105 million of coverage for claims made between June 27, 2015 and June 27, 2017 ("Tower 2"). The two towers consist largely of the same insurers located

2

in the same coverage layers.[1]  Both towers are structured as ABC directors and officers policies covering securities claims against the company.[2]  Each tower is composed of a primary policy and follow-form excess policies.[3]

Both towers define a "Wrongful Act" as:

[A]ny error, misstatement, misleading statement, act, omission, neglect, or breach of duty, including but not limited to a Wrongful Employment Practice, actually or allegedly committed or attempted by:

1.   Solely with respect to coverage under Insuring Agreements A and B, any Insured Person in his or her status as such, or any matter claimed against any Insured Person solely by reason of his or her serving in such capacity;

2.   Solely with respect to coverage under Insuring Agreement C, the Company, but solely with respect to a Securities Claim . . . .[4]

---

[1] App. to Appellants' Joint Opening Br. at A370 [hereinafter A__] (Alexion Pharmaceuticals D&O Insurance Coverage Summary Chart).  Four insurers – Swiss Re, Endurance, Navigators, and Hudson – participated only in one of the towers.  *Id.*  Old Republic participated in both towers but was in different coverage layers.  *Id.*

[2] ABC policies contain three insuring agreements.  Side A covers directors' and officers' liability not indemnified by the company.  Side B reimburses the company for indemnifying its directors and officers.  Side C covers securities claims against the company.  *See* A54 (Chubb Tower 2 Policy at 1); *see also* A158 (Chubb Tower 1 Policy at 1).

[3] *See* A52 (Chubb Tower 2 Policy Declarations at 1); A107 (Swiss Re Tower 2 Policy Declarations at 1); A122 (Endurance Tower 2 Policy Declarations at 1); A148 (Navigators Tower 2 Policy Endorsement No. 2 at 1); *see also* A156 (Chubb Tower 1 Policy Declarations at 1); A209–10 (Hudson Tower 1 Policy Declarations at 1–2).

[4] A91 (Chubb Tower 2 Policy Endorsement No. 13 at 1) (emphasis omitted); A199 (Chubb Tower 1 Policy Endorsement No. 18 at 1) (emphasis omitted).

Both towers define "Interrelated Wrongful Acts" as "all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes."[5]

Both towers define "Claim" as:

1. a written demand for monetary damages or non-monetary or injunctive relief;

2. a civil, criminal, arbitration, administrative or regulatory proceeding for monetary damages or non-monetary or injunctive relief commenced by: (i) service of a complaint or similar pleading; (ii) with respect to a criminal proceeding, a return of an indictment, information, or similar document; or (iii) the receipt of filing of a notice of charges; or

3. a civil, criminal, administrative or regulatory investigation commenced by the service upon or other receipt by any Insured Person of a written notice or subpoena from the investigating authority identifying such Insured Person as an individual against whom such a proceeding described in paragraph 2 immediately above may be commenced.[6]

Both towers also contain the following relevant provisions ("Limit of Liability Provision" and "Notice Provision," respectively):

VII.  LIMIT OF LIABILITY

    A.  All Claims arising out of the same Wrongful Act and all Interrelated Wrongful Acts of the Insureds shall be deemed to be one Claim, and such Claim shall be deemed to be first made on the date the earliest of such Claims is first made, regardless of whether such date is before or

---

[5] A55 (Chubb Tower 2 Policy at 2) (emphasis omitted); A159 (Chubb Tower 1 Policy at 2) (emphasis omitted).

[6] A55 (emphasis omitted); A159 (emphasis omitted).

during the Policy Period. All Loss resulting from a single Claim shall be deemed a single Loss.[7]

IX. NOTICE

B. If, during a Policy Period or, if elected, the Extended Reporting Period, *the Insureds first become aware of facts or circumstances which may reasonably give rise to a future Claim covered under this Policy*, and if the Insureds give written notice to the Insurer during the Policy Period or, if elected, the Extended Reporting Period, of the identity of the potential claimants; a description of the anticipated Wrongful Act allegations; the identity of the Insureds allegedly involved; the circumstances by which the Insureds first became aware of the facts or circumstances; the consequences which have resulted or may result; and the nature of the potential monetary damages and non-monetary relief; *then any Claim which arises out of such Wrongful Act shall be deemed to have been first made at the time such written notice was received by the Insurer.* No coverage is provided for fees, expenses and other costs incurred prior to the time such Wrongful Act results in a Claim.[8]

Tower 2 also contains an endorsement modifying its prior notice exclusion provision ("Prior Notice Exclusion"):

The Insurer shall not be liable for Loss on account of any Claim:[9]

J. alleging, based upon, arising out of, or attributable to any Wrongful Act, fact, or circumstance which has been the subject of any written notice given and accepted under any

---

[7] A61 (Chubb Tower 2 Policy at 8) (emphasis omitted); A165 (Chubb Tower 1 Policy at 8) (emphasis omitted).

[8] A61 (cleaned up); A165 (cleaned up).

[9] A58 (Chubb Tower 2 Policy at 5) (emphasis omitted).

5

other directors & officers policy of which this Policy is a renewal or replacement.[10]

B.

Among Alexion's drug therapies is Soliris, an "orphan drug" that treats rare genetic diseases.[11] In 2017, Soliris had about 11,000 customers worldwide.[12] Soliris had a retail price of $500,000 to $700,000 for each patient.[13] To find and retain these uncommon but highly lucrative patients, Alexion allegedly engaged in extreme business practices.[14] These practices eventually attracted the attention of the Securities and Exchange Commission. On March 9, 2015, the SEC issued a formal investigation order against Alexion ("SEC Investigation Order").[15] The SEC Investigation Order raised possible violations of the federal securities laws involving inaccurate annual 8-K, 10-K, and 10-Q reports;[16] failure to maintain adequate books

---

[10] A79 (Chubb Tower 2 Policy Endorsement No. 9) (emphasis omitted).

[11] A16 (Compl. ¶ 2).

[12] A516 (Bloomberg Article).

[13] A517.

[14] *Alexion Pharm., Inc. v. Endurance Assurance Corp.*, 2024 WL 639388, at *2 (Del. Super. Ct. Feb. 15, 2024) [hereinafter *Superior Court Decision*].

[15] A941 (SEC Investigation Order at 1).

[16] A942.

6

and records;[17] failure to maintain an adequate system of internal accounting controls;[18] and bribing foreign officials and political parties.[19]

Two months later, the SEC served Alexion with a subpoena and a document preservation demand (collectively, "SEC Subpoena").[20] The SEC Subpoena sought all documents relating to Alexion's grant-making worldwide;[21] statements regarding the recall of certain lots of Soliris;[22] compliance with the Foreign Corrupt Practices Act ("FCPA"), including gifts and payments to public health institutions and government agents;[23] and lobbying efforts worldwide, especially in Japan, Brazil, Russia, and Turkey.[24]

On June 18, 2015, Alexion sent its Tower 1 insurers a notice ("2015 Notice") disclosing Alexion's receipt of the SEC Subpoena.[25] Alexion explained that "[w]hile the subpoena seeks information related to Alexion's activities and policies

---

[17] *Id.*

[18] *Id.*

[19] A943–44 (SEC Investigation Order at 3-4).

[20] A372 (SEC Subpoena Letter at 1).

[21] A382 (SEC Subpoena Attachment at 6).

[22] A384 (SEC Subpoena Attachment at 8).

[23] A384–85.

[24] A386–87.

[25] A530 (2015 Notice at 1).

and procedures worldwide, it notes in particular Japan, Brazil, Turkey, and Russia."[26]  Alexion also stated that the SEC Subpoena "seeks information related to Alexion's recalls of specific lots of Soliris and related securities disclosures."[27]

In the 2015 Notice, Alexion also warned the Insurers that "[a]ny determination that Alexion's operations or activities are not, or were not, in compliance with existing United States or foreign laws or regulations, including by the SEC pursuant to its investigation of Alexion's compliance with the FCPA and other matters, could result in consequences to one more of the insureds."[28]  Alexion also foreshadowed that "[o]ther internal or government investigations or legal or regulatory proceedings, including lawsuits brought by private litigations may also follow as a consequence."[29]  Finally, Alexion noted that "[c]ooperating with and responding to the SEC in connection with its investigation of Alexion's FCPA practices and other matters, as well as responding to any future U.S. or foreign governmental investigation or whistle blower lawsuit, could result in substantial expenses."[30]

---

[26] *Id.*

[27] *Id.*

[28] A530–31 (2015 Notice at 1–2).

[29] A531.

[30] *Id.*

C.

On December 29, 2016 – during the Tower 2 coverage period – Alexion stockholders filed a federal securities class action in the District of Connecticut ("Securities Class Action"). The stockholders alleged that Alexion and its directors and officers violated Sections 10(b) and 20(a) of the Exchange Act, as well as SEC Rule 10b-5. They cited a series of unethical and illegal sales and lobbying practices, including obtaining data from partner labs to identify potential customers, deploying extreme fear tactics to garner patients, and funding foreign organizations. They also alleged that, "[d]espite Alexion's efforts to cover up the Company's misconduct, . . . the truth continued to slowly reveal itself" through partial disclosures.[31]

On January 5, 2017, Alexion sent its Tower 2 insurers notice of the Securities Class Action ("2017 Notice"). Chubb,[32] the primary insurer for both towers, initially accepted coverage for the Securities Class Action under Tower 2, but it later reassigned coverage to Tower 1. Chubb justified the reassignment on the grounds that the Securities Class Action "ar[o]se from the circumstances and anticipated Wrongful Acts reported during the 2014–2015 Policy Period, as well as many of the

---

[31] A264–65 (Securities Class Action Am. Compl. ¶ 23).

[32] ACE American Insurance Company is part of the Chubb Group and is referred to as "Chubb" in this appeal.

same Wrongful Acts and Interrelated Wrongful Acts."[33]  Chubb stated that the overlap included Alexion's grant-making activities, its compliance with the FCPA, and its activities in Japan, Brazil, Turkey, and Russia.

On July 2, 2020, Alexion settled with the SEC for about $21.5 million ("SEC Settlement").[34]  On September 12, 2023, Alexion settled the Securities Class Action for $125 million ("Securities Class Action Settlement").  Although the Securities Class Action Settlement exceeded the coverage limits of each tower, Tower 2 provided $20 million more coverage than Tower 1.[35]  Thus, Alexion had an economic incentive to pursue coverage for the Securities Class Action under Tower 2.  It demanded that the settlement be covered under Tower 2.

D.

Alexion filed a coverage action in the Superior Court against Endurance, Hudson, Navigators, Old Republic, and Swiss Re.  Alexion alleged that Endurance, Navigators, and Swiss Re (collectively, "Tower 2 Insurer Defendants") breached their coverage contracts under the Tower 2 policies.  Alexion also sought a declaratory judgment against these defendants that the Securities Class Action is a

---

[33] A557 (Letter from Clyde & Co US LLP to Matthew Batters at 4, Oct. 8, 2018) (emphasis omitted).

[34] A577 (SEC Cease-and-Desist Order at 8).

[35] Tower 1 provided $85 million of coverage.  A28 (Compl. ¶ 36).  Tower 2 provided $105 million of coverage.  A23 (Compl. ¶ 26).

10

"claim" first made during the Tower 2 period.[36] In the alternative, Alexion sought a declaratory judgment against Hudson and Old Republic that the Securities Class Action is a "claim" first made during the Tower 1 period.[37]

In dispositive motion briefing, Alexion argued that the Securities Class Action was unrelated to the SEC Subpoena.[38] Endurance opposed Alexion's motion and argued the opposite.[39] Navigators and Swiss Re also opposed Alexion's motion and sought additional discovery on the SEC investigation.[40] Hudson opposed Alexion's motion to the extent that Alexion sought a determination that the claims belonged in Tower 1.[41] Old Republic was eventually dismissed from the case with prejudice.[42]

---

[36] A44–46 (Compl. ¶¶ 96–102).

[37] A46 (Compl. ¶¶ 103–05).

[38] App. to Appellee Alexion Pharmaceutical, Inc.'s Answering Br. at B38 (Opening Br. in Support of Pl.'s Mot. Summ. J. at 31).

[39] A748 (Endurance Assurance Corp.'s Memo in Opp. Pl.'s Mot. for Part. Summ. J. at 23).

[40] A452–54 (Certain Insurer Defs.' Answering Br. in Opp. to Pl.'s Mot. for Part. Summ. J. at 21–23).

[41] Answering Br. of Hudson Ins. Co. in Opp. to Pl.'s Mot. for Summ. J. on Relatedness, at 12–14, *Superior Court Decision*, Docket No. 60 [hereinafter Super. Ct. Dkt. __].

[42] Stipulation and [Proposed] Ord. of Dismissal with Prejudice as to Claims Against Old Republic Ins. Co.), at 1–3, *Superior Court Decision*, Super. Ct. Dkt. 118.

E.

The Superior Court granted Alexion's motion for partial summary judgment, thereby placing the Securities Class Action coverage in Tower 2.[43] First, the court determined that the "meaningful linkage" standard should be used to interpret the Prior Notice Exclusion. The court also held that there was "little practical difference between two claims having a meaningful link and sharing material facts."[44] Relying on *ACE American Insurance Co. v. Guaranteed Rate, Inc.*, the court also found that the "linkage must be meaningful, not tangential."[45]

Applying the "meaningful linkage" standard to the SEC Subpoena and the Securities Class Action, the court determined that they were "only loosely connected by Alexion's activities in Brazil."[46] The court recognized that the Securities Class Action plaintiffs considered the SEC's findings from the SEC Subpoena to be useful evidence in their case. But the court ultimately rejected it as a meaningful link on two grounds.

---

[43] *Superior Court Decision* at *11.

[44] *Id.* at *9.

[45] *Id.* (quoting *ACE Am. Ins. Co. v. Guaranteed Rate, Inc.*, 305 A.3d 339, 349 (Del. 2023)).

[46] *Id.* at *10.

First, the court found it "unremarkable that ably represented litigants would portray any available evidence as favorable to them."[47] Next, the court observed that the Securities Class Action plaintiffs did not use the SEC's findings to prove their allegations. Instead, they only used them more generally to demonstrate "a sustained pattern of illegal and unethical conduct in the sales and marketing of Soliris."[48] The court ultimately concluded that "the factual connection between the SEC Subpoena and the Securities Action is insufficient to make them related" and placed the Securities Class Action in Tower 2.[49]

## II.

On appeal, the Tower 2 Insurer Defendants argue that the Superior Court erred by treating the 2015 Notice as a "[c]laim" instead of a "disclosure of 'facts or circumstances that may give rise to a *future* claim.'"[50] By "compar[ing] what it saw as two [c]laims," they argue, the court incorrectly framed the inquiry as whether the SEC Subpoena was meaningfully linked to the Securities Class Action.[51] Instead, the proper comparison, they claim, was whether the Securities Action arose from

---

[47] *Id.*

[48] *Id.*

[49] *Id.* at *11.

[50] Appellants' Joint Opening Br. at 25.

[51] *Id.* at 25–26.

13

"any Wrongful Act, fact, or circumstance" that was the subject of Alexion's 2015 Notice. As the Insurers point out, the 2015 Notice disclosed the potential for future claims related to the SEC Subpoena. In the alternative, they argue that more discovery was required to assess whether the Securities Class Action was sufficiently related to the facts or circumstances disclosed.[52]

We review the Superior Court's summary judgment decision *de novo*.[53]

## A.

We look to the contract language to determine the parties' intent.[54] If the language is "clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning."[55] "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[56]

Here, the policies' relevant terms are unambiguous. Both towers contain a broad Notice Provision, which provides that "any Claim which arises out of [any

---

[52] *Id.* at 45.

[53] *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 68 (Del. 2011) ("We review the Superior Court's grant or denial of a summary judgment motion *de novo*. We also review the Superior Court's interpretation of an insurance contract *de novo*." (citations omitted)).

[54] *First Solar, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 274 A.3d 1006, 1013 (Del. 2022).

[55] *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 905 (Del. 2021) (quoting *AT & T Corp. v. Faraday Cap. Ltd.*, 918 A.2d 1104, 1108 (Del. 2007)).

[56] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

properly noticed] Wrongful Act shall be deemed to have been first made at the time such written notice was received by the Insurer."[57] The Notice Provision is not limited to mature Claims like filed lawsuits. It includes a "notice of circumstances" where the insured can give notice when it "first become[s] aware of facts or circumstances which may reasonably give rise to a future Claim" under the policy.[58] In claims-made insurance programs, the notice of circumstances benefits the insured. The insured can lock in existing insurance coverage for later related claims even though the facts and circumstances have yet to occur or might be somewhat different.[59]

Under the Limit of Liability Provisions in both towers, "[a]ll Claims arising out of the same Wrongful Act and all Interrelated Wrongful Acts . . . shall be deemed to be one Claim . . . first made on the date the earliest of such Claims is first made . . . ."[60] In other words, all Claims arising out of a properly noticed Wrongful

---

[57] A61 (Chubb Tower 2 Policy at 8) (emphasis omitted); A165 (Chubb Tower 1 Policy at 8) (emphasis omitted).

[58] A61 (emphasis omitted); A165 (emphasis omitted).

[59] *See* Restatement of the L. of Liab. Ins. § 33 (Am. L. Inst. 2019) (explaining that a "notice of circumstances" clause "provide[s] policyholders the option to secure coverage under an existing claims-made policy for a legal action that may be brought in the future").

[60] A61 (Chubb Tower 2 Policy at 8) (emphasis omitted); A165 (Chubb Tower 1 Policy at 8) (emphasis omitted).

Act or Interrelated Wrongful Act are treated as a single Claim made on the earliest date the insurer received the insured's written notice.

The parties do not dispute that Alexion's 2015 Notice was proper under the Tower 1 policies.[61] Rather, they dispute whether the Securities Class Action is a claim arising out of any Wrongful Acts or Interrelated Wrongful Acts disclosed by Alexion in the 2015 Notice.[62] Tower 1's Notice Provision language – "arises out of" – is undefined. Tower 2's Prior Notice Exclusion language – "alleging," "based upon," "arising out of," and attributable" – is also undefined. With no other textual evidence of the parties' intent found in the policies, we interpret "arises out of," and other similar terms, as requiring some "meaningful linkage between the two conditions imposed in the contract."[63] Although these terms are "paradigmatically broad,"[64] and we interpret them broadly, the linkage must be meaningful and not tangential.[65] Thus, if the Securities Class Action is meaningfully linked to any

---

[61] Alexion drafted the 2015 Notice, which Chubb accepted on June 30, 2015. A534–35 (Letter from ACE (Chubb) to Michael Greco at 1–2, June 30, 2015).

[62] Under both towers' limit of liability provision, all claims arising out of the same Wrongful Act or Interrelated Wrongful Acts are deemed to be a single claim. A61 (Chubb Tower 2 Policy at 8); A165 (Chubb Tower 1 Policy at 8).

[63] *Pac. Ins. Co. v. Liberty Mut. Ins. Co.*, 956 A.2d 1246, 1257 (Del. 2008).

[64] *City of Newark v. Donald M. Durkin Contr., Inc.*, 305 A.3d 674, 680 (Del. 2023) (citations omitted).

[65] *ACE Am. Ins. Co.*, 305 A.3d at 349.

Wrongful Act, including any Interrelated Wrongful Act, disclosed by Alexion in the 2015 Notice, the Securities Class Action is covered by Tower 1.

## B.

Although we agree with the Superior Court that "meaningful linkage" is the appropriate standard of comparison, we disagree with its conclusion that "the link between the securities action and the prior incident is tangential, not meaningful."[66] As an initial matter, the court erred in identifying the objects of comparison for the "meaningful linkage" analysis. Alexion's 2015 Notice was not a claim. Chubb accepted Alexion's 2015 Notice "as a notice of circumstance that may give rise to a claim."[67] Indeed, Chubb explicitly noted that, at the time of this acceptance, "there has been no Claim against either the Company as a Defendant or the Company's directors and officers."[68]

Nevertheless, the Superior Court treated the 2015 Notice as a claim. After it "established that a meaningful linkage is required to bar coverage," the Superior Court concluded that "the remaining question is whether such a link exists between the SEC Subpoena and the Securities Action."[69] Focusing its inquiry on the link

---

[66] *Superior Court Decision* at *1.

[67] A535 (Letter from ACE (Chubb) to Michael Greco at 2, June 30, 2015).

[68] *Id.*

[69] *Superior Court Decision* at *9.

between the SEC Subpoena and the Securities Class Action, the court held that the latter "is not related to a *previous claim*."[70] By treating the 2015 Notice as a claim, however, the Superior Court narrowed the scope of the inquiry to the wrongful acts alleged in the SEC Subpoena. Instead, the court should have focused on Alexion's disclosure of the SEC investigation in the 2015 Notice. It should have asked whether the Securities Class Action is meaningfully linked to any of the alleged wrongful acts disclosed in the 2015 Notice.

C.

Upon *de novo* review, we find that the Securities Class Action is meaningfully linked to the wrongful acts disclosed in the 2015 Notice. First, both involve the same alleged wrongdoing – Alexion's grantmaking activities worldwide. The 2015 Notice disclosed that Alexion had received a SEC Subpoena "requesting information related to Alexion's grant-making activities and compliance with the Foreign Corrupt Practices Act."[71] The 2015 Notice also disclosed that the SEC Subpoena sought information on Alexion's activities, policies, and procedures worldwide, especially in Brazil, Japan, Russia, and Turkey.[72]

---

[70] *Id.* at *1 (emphasis added).

[71] A530 (2015 Notice at 1).

[72] *Id.*

The Securities Class Action alleged the same wrongdoing investigated by the SEC and disclosed by Alexion in the 2015 Notice. The plaintiffs alleged that Alexion improperly issued grants to patient advocacy groups in Brazil to sue the government for reimbursements for Soliris, rather than directly negotiate the price of Soliris with the Brazilian government.[73] Furthermore, the first Securities Class Action complaint explicitly referred to the SEC Subpoena and the SEC's Foreign Corrupt Practices Act investigation into Alexion's grantmaking to patient advocacy groups.[74] The Securities Class Action also referred to a *Bloomberg* article, which reported on the SEC's Foreign Corrupt Practices Act investigation into Alexion's grantmaking activities in Brazil, Colombia, Japan, Russia, and Turkey.[75] These wrongful acts raised in the Securities Class Action are the same ones disclosed in Alexion's 2015 Notice.

Alexion argues that the focus of the SEC investigation was different from that of the Securities Class Action.[76] It claims that, "[u]nlike the SEC Investigation, which focused on . . . examples of book-keeping violations under the FCPA in Brazil, the Securities Action alleged that Alexion's third-party payments to a patient

---

[73] A304–06 (Securities Class Action Am. Compl. ¶¶ 155–62).

[74] A615 (Securities Class Action Compl. ¶ 108).

[75] A527 (Bloomberg Article).

[76] Appellee Alexion Pharmaceuticals, Inc.'s Answering Br. at 29.

advocacy group in Brazil unethically funded fraudulent lawsuits, and that Alexion failed to disclose this practice."[77] This difference, Alexion contends, renders the link "tangential" and "insufficient to lasso the entire Securities Action back into Tower 1."[78]

We are unpersuaded. Both the SEC investigation and the Securities Class Action involve the same underlying wrongful act – Alexion's improper sales tactics worldwide, including its grantmaking efforts in Brazil and elsewhere. Because both the SEC investigation and the Securities Class Action involve the same conduct, it does not matter whether the SEC and the stockholder plaintiffs are different parties, asserted different theories of liabilities, or sought different relief. It is the common underlying wrongful acts that control.

In any event, Alexion overstates the differences between the two theories of liability. In addition to a FCPA violation, the SEC investigation also subpoenaed all documents, including federal securities disclosures such as 8-K, 10-K, and 10-Q reports, concerning Alexion's statements regarding the Soliris recall.[79] The Securities Class Action alleged the same possible Exchange Act and SEC Rule

---

[77] *Id.*

[78] *Id.*

[79] A384 (SEC Subpoena Attachment at 8).

violations.[80]  It is true that the SEC investigation and the Securities Class Action alleged non-identical time periods.  But while not perfectly identical, they do meaningfully overlap.[81]

III.

Both investigations involved the same Wrongful Act – Alexion's grantmaking activities.  A meaningful linkage exists between the Securities Class Action and the SEC investigation as disclosed by Alexion in its 2015 Notice.  Under the policies of both towers, the Securities Class Action claim is deemed to have been first made at the time the 2015 Notice was received by Chubb – during the Tower 1 coverage period.  Therefore, coverage is under Tower 1.  Applying the Prior Notice Exclusion provision of Tower 2, no coverage is available under Tower 2.  The judgment of the Superior Court is reversed.

---

[80] A360–66 (Securities Class Action Am. Compl. ¶¶ 354–78).

[81] Alexion's 2015 Notice stated that the SEC Subpoena demanded preservation of documents "on or after January 1, 2009." A530 (2015 Notice at 1).  The class period in the Securities Class Action is between January 30, 2014, and May 26, 2017.  A256 (Securities Class Action Am. Compl. at 1).